[Crim. No. 2748. In Bank.—April 29, 1926.]

## THE PEOPLE, Respondent, v. THOMAS CARMICHAEL, Appellant.

[1] CRIMINAL LAW — MURDER — SUFFICIENCY OF EVIDENCE. — In this prosecution for murder it is held that the evidence was sufficient to justify the verdict convicting the defendant of manslaughter.

[2] ID.—EXAMINATION OF JURORS — BELIEF IN SELF-DEFENSE — LACK OF PREJUDICE.—In a prosecution for murder, the defendant was not prejudiced by the refusal of the court to permit his counsel to ask prospective jurors whether they believed in the right of self-defense, where the jurors to whom the question was asked were afterward excused and all of the jurors who were finally accepted were examined upon the subject, and it does not appear that defendant was forced to use his peremptory challenges to excuse any of the jurors who were not allowed to answer such questions.

[3] ID.—COMPROMISE VERDICT.—In a prosecution for murder, defendant was not prejudiced by the court's refusal to allow defend-

ant's counsel to examine prospective jurors as to whether they would compromise upon a verdict and find the defendant guilty of a lesser offense as long as they had a reasonable doubt of his guilt, where the same question was asked and answered without objection thereafter by a number of other jurors including eight finally accepted, as it was the defendant's counsel's duty, after the court changed its ruling, to examine the jurors on this matter.

[4] ID.—FORMER TRIAL—EXAMINATION OF JURORS AS TO RESULT.— In a prosecution for murder, it was prejudicial error to refuse to permit defendant's counsel to examine prospective jurors as to whether they knew that the case had been tried before and whether the failure of the former jury to agree would prejudice them against the defendant, whether they had heard how the former jury stood on the question of guilty or innocent, whether if they knew that the former jury had stood ten for conviction and two for not guilty that would prejudice them against the defendant, whether they recognized that evidence might be produced on the second trial which was not brought out on the first, and whether knowledge as to how the former jury stood had left their minds as open and impartial as if they had never heard of the case; and such error was not cured by the general statement by the jurors, in reply to questions by the prosecution, that they had not formed or expressed any opinion regarding the guilt or innocence of the defendant and that they knew of no reason why they could not give the defendant a fair and impartial trial and that they would be willing to be tried by a jury who felt toward them as they felt toward the defendant.

[5] ID. — EXAMINATION OF JURORS — PREJUDICIAL ERROR — RIGHT TO IMPARTIAL JURY—SECTION 4½, ARTICLE VI, CONSTITUTION.—In a prosecution for murder, where the trial court has committed prejudicial error in refusing the defendant the right to examine the jurors as to the effect on their minds of the standing of a former jury in the case, the defendant has been deprived of the fundamental right to be tried by an impartial jury, and section 4½ of article VI of the constitution cannot be relied upon to sustain the judgment.

[6] ID.—CROSS-EXAMINATION—STATEMENTS OF DECEASED.—In a prosecution for murder, where a prosecution witness testified to events that took place on the day of the tragedy between the deceased and the defendant, and particularly as to the boastful and boisterous conduct of the deceased and threatening attitude toward others, quoting conversations between the deceased and others, it was error to sustain objection on cross-examination as to whether the deceased did not say on the afternoon of the homi-

6. See 13 Cal. Jur. 694; 13 R. C. L. 821.

cide that the night before he had been in a fight and broken two ribs of a man and smashed his nose, as such statement, if made in the presence of the defendant, might have an important bearing upon his plea of self-defense; nor is such error cured by the fact that the defendant testified that the statement was made by the deceased in the presence of himself and others at said time.

[7] ID.—INSTRUCTIONS—LACK OF ERROR IN REFUSING.—In a prosecution for murder, there is no error in the refusal of the court to give any instructions proposed by the defendant, where it, in instructions prepared by the judge, instructed the jury fully upon the law applicable to the case.

---

(1) 17 C. J., p. 264, n. 89; 30 C. J., p. 316, n. 68.    (2) 17 C. J., p. 291, n. 26.    (3) 17 C. J., p. 291, n. 26.    (4) 16 C. J., p. 512, n. 57; 17 C. J., p. 291, n 27.    (5) 17 C. J., p. 369, n. 6.    (6) 17 C. J., p. 336, n. 22; 40 Cyc., p. 2483, n. 65, p. 2491, n. 18.    (7) 16 C. J., p. 1063, n. 85; 30 C. J., p. 370, n. 30.

APPEAL from a judgment of the Superior Court of Butte County.  H. D. Gregory, Judge.  Reversed.

The facts are stated in the opinion of the court.

W. E. Duncan, Jr., and Alta Duncan Hengy for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, Deputy Attorney-General, and Dixwell L. Pierce for Respondent.

CURTIS, J.—The appellant was charged with the crime of murder. The jury found him guilty of manslaughter. He appeals from the judgment and also from the order denying his motion for a new trial. The district court of appeal reversed the judgment and the case comes before this court after an order granting a hearing herein. The facts in the case show substantially that the deceased met his death from a gunshot wound inflicted by the appellant on the eighteenth day of December, 1923. The homicide occurred at a place known as Bidwell Bar Canyon, in the county of Butte. In this canyon the deceased, just prior to his death, was residing with his father, Thomas Lucas, in a small house owned by the latter. Appellant at the same

7.  See 8 Cal. Jur. 366; 14 R. C. L. 751.

time was living with one Joseph Bukal, in Bukal's house located near the Lucas place. The shooting occurred in the evening. On this day Bukal had been engaged in killing hogs in a shed or slaughter-house belonging to Thomas Lucas, and located in the near vicinity of the respective houses of Lucas and Bukal. Besides Bukal, the appellant, the deceased, and Thomas Lucas, there were also present Oscar Carlson and a man named Stillwell. With the exception of Carlson these men were all assisting Bukal in the slaughtering of the hogs. About 2 o'clock in the afternoon they finished their work and went up to the Bukal house for lunch. There, in addition to eating their lunch, they drank some wine furnished them by Bukal. They had also had a pitcher of wine at the slaughter-house before lunch. The appellant drank very little of the wine and Carlson did not drink any. The others imbibed more or less freely, especially the deceased and his father, who became to a perceptible extent under the influence of the wine. After lunch there was considerable boisterous conduct, called by some of the witnesses "horse-play," in which the deceased unquestionably took the leading part. For some reason, probably from the effects of the wine, the deceased became quite boastful and demonstrative. He was a large man, over six feet three inches in height, and he appeared bent upon demonstrating his physical prowess. This was apparently done in a spirit of good feeling and received by the other men in the same spirit. While many oaths and much foul language was employed, both by the deceased and his companions, there is nothing to indicate that the use of such oaths or language was for the purpose of expressing any ill feelings or anger on the part of any of the men. About 5 o'clock in the afternoon the men returned to the slaughter-house for the purpose of preparing the hogs killed in the early part of the day for domestic use. Here the deceased continued his boisterous conduct toward other members of the party. This lasted for some time, but without any serious results, although some of the men, including the appellant, had been rather roughly handled by the deceased. In the meantime the appellant returned to the Bukal house. While in the house he could hear the men at the slaughter-house, including the deceased, as he continued his threatening conduct toward the others. After listening to them for a short time he armed himself with his pistol and returned to the place where the men

were. At the time of his arrival there, or shortly thereafter, the deceased had turned his attention to Bukal, who was a much older and smaller man than the deceased. Bukal had a lantern in his hand and fearing that it might be broken by the deceased, handed it to the appellant and started on a run toward his house. The appellant followed him and behind both of them came the deceased. The latter was swearing and cursing the men in front of him, and Bukal, probably in a milder vein, replied to deceased in language far from complimentary. Finally the deceased said: "Go on, go on, go on to bed," and almost immediately thereafter four shots were fired in rapid succession. These shots the evidence shows were fired by the appellant and resulted in the death of the deceased. No one saw either the appellant or the deceased at the precise time the shots were fired. Bukal, who was from ten to twelve feet from the appellant at the time, testified that he heard three shots. When he heard the first shot he turned around and saw the deceased "tumble down at the side of the road and then Carmichael run into the house." He also testified that the shots were "right one after the other" and that he did not see the appellant shoot, but the shots had all been fired when he turned around. Carlson, who was also only a short distance from the place where the men were at the time of the shooting, heard the deceased say, "Go on, go on, go on to bed," and after a lapse of some seconds during which a few words were spoken that he could not understand, "rapidly after that three shots were fired right close together, one after another." All the witnesses testifying on the subject, except the appellant, stated that they did not see the deceased have any weapon in his possession on that day. The appellant testified that the deceased during the day had a knife in his hand. The appellant, however, made no mention of the knife in the hand of the deceased to the sheriff or to the deputy sheriff of the county to whom he told his story a few hours after the shooting. He admitted, however, that he had fired four shots at the deceased and claimed that the latter just before the shots were fired had rushed upon him and threatened to kill him and that he shot deceased in defense of his own life. Doctor Whiting, who examined the body of the deceased about ten hours after the shooting, testified that he found five bullet wounds upon the body. Two of these were in the right arm and were caused by a

bullet entering the back of the arm and, passing along the axis of the arm, sharply downward, came out along the surface of the arm about three inches from the point of entrance. Another wound on the body was caused by a bullet entering the right side of the body about on the level of the tip of the twelfth rib. A bullet was found on the corresponding left side of the body at about the same level up and down and from the back to the front as the wound made by the bullet entering the right side of the body. This bullet was pointed in the outer direction and was embedded next to the skin. The doctor could not say that this bullet was the same one that caused the wound just described. A fourth wound was found in the back of the body and was caused by a bullet entering the body at a point about two and one-half inches to the right of the middle of the spinal column, the middle of the back, in other words, and about five inches above the crest or tip of the hip. This bullet passed right through the body from backward to forward and to the left and cut a crease in the front portion of the backbone at a level of the fourth lumbar or loin vertebra, fracturing the body of the vertebra and cut into and almost severed the large aorta artery which lies in front of the vertebra and which carries the blood from the heart to the abdomen. The exit of this bullet was evidently the fifth wound found by the doctor upon the body of the deceased. The bullet found in the body was a 44-caliber steel jacket missile. Either of the wounds made by the two bullets last mentioned, in the opinion of the doctor, was sufficient to cause death, but the one made by the bullet entering the body from the back and cutting the aorta artery would cause death more rapidly. It would have caused death inside of twenty seconds. There was evidence given by the defendant himself, which, if believed by the jury, tended strongly to justify the appellant in slaying the deceased in self-defense. He also introduced depositions and other evidence from men of standing in the community in which he had lived, testifying to his good reputation.

[1] Appellant's first contention is that the evidence is not sufficient to justify the verdict of conviction. It is true that he tells a story to the jury which, if accepted by them at its full face value, would have justified a verdict of acquittal. But the evidence of other witnesses heretofore set forth is not such that this court can say that as a matter

of law it fails to show the appellant blameless in the killing of the deceased. The jury, who heard all the evidence, both that in favor and that against the appellant, concluded that he was guilty of the crime of manslaughter. Their verdict, in our opinion, was based upon competent evidence adequate to support it and should not be disturbed by this court on the ground of its insufficiency.

[2] The next contention of appellant is that the court erred in refusing to permit him to ask certain questions of prospective jurors upon their *voir dire* examination. Various assignments of error are made under this contention. Some of these assignments are entirely without merit. For instance, appellant assigns as error the refusal of the court to permit him to ask a prospective juror whether he believed in the right of self-defense. This question was asked juror Prince, the first juror interrogated regarding his qualifications to act in the case. An objection to this question was made by the prosecution and sustained by the court and thereupon the appellant stated to the court that he wished it understood that he desired to ask this question of each and every juror examined in the case, and in reply the court stated that it would be so understood. The juror Prince was subsequently excused, as were a large number of other members of the panel upon their *voir dire* examination. The twelve jurors, however, who were finally accepted to try the case, and who actually did so, notwithstanding the sustaining of the objection to the question asked of the juror Prince and the understanding between the court and counsel following said ruling, were all questioned fully by appellant, without objection, upon the subject of self-defense and as to their belief in this right by a person in danger of either death or great bodily injury. It is evident, therefore, that appellant was not in any way prejudiced by the refusal of the court to permit him to interrogate a prospective juror, afterward excused, upon a matter concerning which he was permitted to fully examine all the jurors who were finally accepted to try the case. It is not even claimed by appellant that he was forced to use any of his peremptory challenges for the purpose of excusing juror Prince or any other juror whom the court refused to permit him to examine as to his belief in the right of self-defense. [3] Another instance in which appellant claims that he was unduly limited in his *voir dire* examination of prospective jurors was the refusal

of the court to permit him to ask certain jurors whether they would compromise upon a verdict and find the appellant guilty of a lesser offense as long as they had a reasonable doubt of his guilt. This question was also asked the juror Prince, and, upon objection, the court refused to permit him to answer it. A like understanding was had as that relating to the previous question, that it might be understood that appellant desired to ask the same question of each and every juror examined in the case and that the court would refuse to permit the same. While the court sustained an objection to this question when asked the juror Prince, subsequently, and after the *voir dire* examination of four of the jurors (finally accepted to try the case) had been concluded, the same question was asked and answered without objection by a number of other jurors called in the case, including eight of the jurors who were finally accepted to try the case. It must have become apparent to appellant that the court, in permitting this question to be answered by a large number of jurors during the progress of the trial but subsequent to the examination of the juror Prince, had changed its attitude as to the propriety of asking this question. It was appellant's duty, therefore, if he desired to further interrogate the four jurors tentatively passed by him, and to whom this question had not been propounded, to have asked permission of the court, if any such permission were necessary, and if it were not, to have proceeded without such permission to examine these jurors as to their attitude regarding a compromise verdict. As the court, at least during the latter portion of the examination of the jury, was permitting this question to be asked of the jurors generally, it is not unreasonable to suppose that he would have granted appellant permission to have asked it of the four remaining jurors. No claim is made by appellant that he asked said question or any question similar thereto of any of said four jurors or that he had sought leave of court so to do, or that the court refused him this right except in so far as the court had expressed its attitude in this respect when it sustained the objection to a like question propounded to the juror Prince. It would be highly technical under these circumstances to hold that appellant was denied any substantial right to which he was entitled by the refusal of the court in the first instance to permit examination of the jurors in the respect complained of. His failure to further interrogate

the four jurors must be taken as a waiver on his part of his right to do so, and he has now no just reason to complain. In a number of other instances objections to questions asked by appellant to prospective jurors upon their *voir dire* were sustained by the court. We have carefully considered the rulings of the court in this respect and the claim of the appellant that he was prejudiced thereby. With one exception, which we will deal with at length hereafter, we are unable to agree with appellant that he sustained any substantial damage by the failure of the court to permit him to so examine said jurors.

[4] The one exception above referred to presents a more difficult and to our minds a more serious question. This was the second trial of the defendant upon the charge stated in the information. Upon the first trial the jury had disagreed and for this reason they had been dismissed and the case reset for trial. Upon the present trial, after the first twelve persons summoned as jurors in the case had been called to the jury-box, the attorney for the appellant sought to interrogate them relative to the failure of the former jury to agree upon a verdict and what influence, if any, the action of the former jury would have upon their verdict. An objection to such inquiry was made by the prosecution and sustained by the court. Furthermore, the court forbade appellant from further mentioning the former jury to the members of the present jury, and upon appellant's attorney stating to the court that he desired to ask certain questions of the jury relative to said subject the court refused to permit him to ask any of such questions, but suggested that he might submit such questions in writing, as he desired to ask, to the reporter in the absence of the jury. The following proceedings show the action taken:

"Mr. Duncan: (Attorney for Appellant.) I wish it understood that I desire to ask these questions of each and every juror that may be called in the case and I assume the court's ruling will be the same in each case?

"The Court: The same in each case.

"Mr. Duncan: And it may be understood for the purpose of the record?

"The Court: Yes.

"Mr. Duncan: And we may file with the reporter such questions as we may wish to ask?

"The Court: You may."

Some two weeks after the jury rendered its verdict the attorney for appellant, pursuant to the above understanding, filed with the reporter the following list of questions:

"Do you know or have you heard that this case has already been tried before a jury in this court?

"Would the fact if it be such that the former jury trying the case had failed to agree prejudice you against the defendant?

"Did you know or have you heard how the jury trying this case stood on the question of 'Guilty' or 'Not guilty'?

"If you know or have you heard that the former jury stood 10 for guilty and 2 for not guilty would that prejudice you in any way against the defendant?

"Do you recognize that evidence might be produced on this trial which was not brought out on the first trial?·

"Do you think that your knowledge or information as to how the former jury stood, has left your mind as open and impartial as tho you had never heard of the case?"

It is now contended by appellant that the court committed prejudicial error in refusing to permit him to interrogate the jurors by asking the above questions. It is not clear from the record upon just what theory the court sustained the objection of the prosecution. We think the questions were proper, as the answers thereto would tend to show the existence or nonexistence of actual bias on the part of the jurors with reference to the case then on trial. If any of the jurors had heard the result of the former trial and that the jury therein had stood ten for conviction and two for acquittal, we do not think it unreasonable to conclude that such a juror might be influenced by such knowledge and that he might well conclude that if ten out of twelve of the former members of the jury believed the appellant guilty, that there was a strong probability of his guilt. Persons entertaining such opinions, we think it must be conceded, are not and cannot be fair and impartial jurors such as one accused of crime is entitled to have pass upon the accusations against him. The only argument presented by the attorney-general to justify the ruling of the court in sustaining objections to these questions is that the appellant is not prejudiced thereby for the reason that the record shows that, although he had exhausted all of his peremptory challenges during the trial, he did not request or show any

desire to use any one or more further peremptory challenges for the purpose of excusing any of the jurors who were finally sworn to try the case. In support of his position he cites the case of *People* v. *Schafer,* 161 Cal. 573, 576 [119 Pac. 920, 921]. In that case the defendant challenged a juror for cause, which challenge the court denied. Thereupon, the defendant peremptorily challenged him. On appeal the appellant claimed that the trial court erred in disallowing his challenge of the juror for cause. The court held that he was not prejudiced thereby, for the reason that, although he subsequently exhausted all of his peremptory challenges, "it does not appear that he had occasion or desire to use an additional peremptory challenge, or that each and all of the twelve jurors finally accepted and sworn were not entirely satisfactory to him." We cannot accept this case as an authority in the present action. The facts thereof are not in any way analogous to those now before us. In that case the objectionable juror was excused and no showing was made that any of those finally accepted to try the case were not satisfactory to the appellant. In the present action the appellant, by the rulings of the court sustaining objections to his questions, was denied the right to show that the jurors were objectionable to him. It would have been an idle act for him, therefore, to have asked for a further peremptory challenge after exhausting all allowed him by law, for the reason that, had the court granted him an additional challenge or any number of them and had he exercised all that the court allowed, his position would in no way have been improved for the reason that he would still be in the dark as to the state of mind of those jurors who might have heard of the result of the former trial, and there still might be among the jurors he was forced to accept, one or more and possibly all of them who had heard of such result and who entertained a belief that, by reason thereof, there was great probability of appellant's guilt. Other authorities expressing a similar rule to that found in *People* v. *Schafer, supra,* are cited in the petition for a hearing herein by the attorney-general, but, in our opinion, they are not more in point than is the Schafer case.

Certain general questions were asked and answered by each of the jurors upon their *voir dire* examination. Among these questions was whether the juror had formed or ex-

pressed any opinion regarding the guilt or innocence of the defendant; whether he knew of any reason why he could not give the defendant a fair and impartial trial and whether he would be willing to be tried by a jury "who felt toward you as you feel toward the defendant." The jurors all gave a negative answer to the first two questions and an affirmative answer to the last one. Each juror was also asked whether he had talked with any person who purported to be a witness in the case or was a member of the former jury, and replied that he had not. It is contended by the respondent on this hearing that the error of the court, if any such error was made, in refusing to permit appellant to examine the jurors regarding the result of the former trial and as to their state of mind upon learning of such result, if any of them had learned of said result, was cured by these general and special questions asked of the jurors. We are not certain that this is the case. The asking of a general question of a juror does not always direct his attention to all the elements which go to make up the subject matter of such question. For example, a juror in answer to a general question might state with perfect sincerity that he knew of no reason why he could not give the defendant a fair and impartial trial, but upon a further and more minute examination it might be shown that his conception of a fair and impartial trial for one who had been previously tried by a jury, ten of whom believed him guilty, differed in many material respects from that which the law accords to all persons accused of crime. Furthermore, he might presume the defendant innocent until proven guilty, but his state of mind might be such that it would require less evidence to convince him of defendant's guilt in a case where the latter had been previously tried with the result as above indicated, than if no previous trial had been had. He might be in perfect accord with the law which declares that a defendant shall not suffer conviction until proven guilty beyond all reasonable doubt, but having heard that the former jury stood ten to two for conviction, he might not feel called upon to scrutinize and weigh the evidence with that extreme care and caution which the law enjoins of every juror in passing upon the life and liberty of one against whom a criminal accusation has been made. We are not satisfied, therefore, that the error of the court in refusing permission to appellant to examine the jurors as to the

result of the former trial was cured by the answers of the jurors to these general questions. Nor do we think that their statements that they had not talked with any of the former jurors or persons purporting to be witnesses in the case necessarily indicated that they had not heard of the result of the former trial. There were other means through which they could have gained this information than through the former jurors and witnesses in the case. We all know as a matter of general knowledge that frequently the result of a jury failing to agree upon a verdict becomes the topic of general conversation in the community and is the subject of much comment and discussion. It is not unreasonable to suppose that this case, where the defendant was on trial for murder, attracted the attention of the public at large and that the failure of the jury to agree at the first trial became the topic of general conversation and that the standing of the jury was known generally by the public. It would have been somewhat unusual, then, if some of the jurors and possibly all of them, had not heard that the first jury stood ten to two for conviction, and to gain this information it would not have been necessary for any of them to have talked with the members of the former jury, or with any of the witnesses in the case. The answers of the jurors, therefore, that they had not talked with the former jurors or any person purporting to be a witness in the case did not necessarily show that they had not heard how the former jury stood, and did not, in our opinion, cure the error of the court in denying the appellant the right to interrogate the jurors upon that subject.

The attorney-general contends that the method adopted by the court in permitting the appellant to file with the court reporter a list of questions which he desired to ask of prospective jurors was hardly fair to the prosecuting attorney and that it would not be assumed that he would object to questions which he had not seen and which, in fact, had no existence as far as the record goes until long after the trial. We agree that this practice is not usual and in our opinion it has little to commend it for favorable consideration. But any defect which might be attributed to it cannot be chargeable to the appellant. He simply followed the suggestion made to him and which afforded to him the only means whereby he could perfect his rights and present

a record of the proceedings had at the trial to the appellate court.

[5]   No authority has been called to our attention which can be construed as holding that section 4½ of article VI of the constitution can be relied upon to sustain the judgment herein.   As we have already said, in our opinion it was prejudicial error for the court to refuse the appellant the right to examine the jurors as to the effect on their minds of the standing of the former jury.   The ruling of the court in thus limiting the appellant in his examination of the jurors was, in our opinion, the deprival of the appellant of a fundamental right,—a right to be tried by an impartial jury. It was never intended by this provision of the constitution to take from the defendant in a criminal action his fundamental right to a jury trial or in any substantial manner to abridge this right (*People* v. *Wismer,* 58 Cal. App. 679, 688 [209 Pac. 259]).

[6]   Oscar Carlson, who was a witness for the prosecution, testified to many of the events which took place on the day of the tragedy, both at the Bukal home and later at the slaughter-house, between the appellant, the deceased, and other members of the party, and particularly as to the boastful and boisterous conduct of the deceased and his threatening attitude toward the other men.   He detailed the conversations that took place on these occasions between the deceased and the others, quoting largely, as he remembered them, the exact words used by the different members of the company.   On cross-examination the appellant asked this witness whether the deceased did not say on the afternoon of the day of the shooting that the night before he had been in a fight and broken two ribs of a man and smashed his nose.   This question was objected to by the prosecution and the objection sustained by the court.   The ground upon which the court apparently sustained the objection was that it was not proper cross-examination.   In view of the direct testimony of this witness, in which he was permitted to give all that he heard and saw on that afternoon regarding what took place between the men, we think this question was not subject to the objection that it was not cross-examination.   While it is not entirely clear from the language of the question that this remark was made in the presence of the appellant, yet, in the direct examination of this witness in which he detailed the transactions of the day, he

invariably included the appellant as among those present at the various conversations which the deceased carried on with the others. We think it must have been apparent from what had preceded that, at the time the question was asked, it was the intention to prove that the deceased made the remarks attributed to him in the presence of the appellant. If made in the presence of the appellant the statement was material and might have had an important bearing upon his plea of self-defense. We think the question was properly asked upon cross-examination and that the court erred in sustaining the objection. We cannot agree with respondent that this error was cured by the admission of the testimony of the appellant himself to the effect that this same statement was made by the deceased in the presence of himself and others on the afternoon of the day of the tragedy. The appellant was entitled to prove by disinterested witnesses, if he could, that the deceased made the statement attributed to him. It might be that the jury would hesitate to accept the uncorroborated evidence of a defendant in a case, when, if his testimony were supported by the evidence of a disinterested witness, they might take an entirely different attitude toward it. The cases cited by respondent do not go to the extent claimed for them nor support the contention that the error complained of was cured by the subsequent testimony of the appellant.

There are other assignments of error involved in the rulings of the court as to the admission and rejection of evidence. They are not, however, of any serious consequence and we do not consider it necessary to refer to them in detail.

[7] The court refused to give any of the instructions proposed by appellant. The judge of the court did, however, in instructions prepared with great care by himself, instruct the jury fully upon the law applicable to the case. We think these instructions covered all the matters upon which the jury were required to be informed and that there was no error in refusing the proposed instructions of appellant. The appellant criticises the instructions prepared and given by the court and insists that in many respects they have failed to correctly state the law applicable to the case. We think on the whole these criticisms are not well founded.

We are, however, in accord with the opinion of Mr. Justice Hart, the writer of the decision rendered by the court of appeal of the third district in this case, in which the court says:

"One of the given instructions, however, is to some extent subject to the criticism urged against it by counsel for the defendant—not that we think that it does not, when rightly read and understood, contain a correct statement of the rule, but for the reason that the word 'absolutely,' as used therein, might render it misleading to the average lay mind. The instruction states, 'to justify a person in killing another in self-defense, it must appear that the danger, either real or apparent, was so urgent and pressing that, in order to save his own life or Bukal's life, or to prevent himself or Bukal receiving great bodily harm, the killing of the other was *absolutely* necessary.' The word 'absolutely' might have the effect of leading jurors to believe that, to bring it within the right of self-defense, the act of killing must have actually been necessary. Such an impression of the law would of course, be erroneous, since there may be a justifiable homicide where the actual necessity for killing is not present. If the circumstances be such as to excite the fears of a reasonable person, and it appears that the party killing 'acted under the influence of such fears alone,' then the slaying is justified, although it may thereafter transpire that there existed no real ground for such fears. Of course, if such fears existed, then, *apparently,* the killing would be as 'absolutely' necessary as it would be if the danger of death or bodily harm at the hands of the assailant were actual. In the latter sense the criticised portion of the instruction was undoubtedly intended to be understood by the court. However, the elimination of the word 'absolutely' in the connection in which it is used in the instruction under review is recommended."

For the reasons stated herein, the judgment and order denying the motion for a new trial are reversed.

Richards, J., Cashin, J., *pro tem.,* Lennon, J., Waste, C. J., and Shenk, J., concurred.