[No. C001739. Third Dist. Nov. 20, 1987.]

THE PEOPLE, Plaintiff and Appellant, v.
JIMMY LOUIS OLIVER, Defendant and Respondent.

## COUNSEL

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, and W. Scott Thorpe, Deputy Attorney General, for Plaintiff and Appellant.

G. Dave Teja for Defendant and Respondent.

## OPINION

SPARKS, J.—This is an appeal by the People (Pen. Code, § 1238, subd. (a)(3)) from an order granting the defendant's motion for a new trial on grounds of jury misconduct. (Pen. Code, § 1181, subd. 3.) The narrow issue before us is whether the mere presence of a court reporter in the jury room during a portion of the jury's deliberations constitutes reversible error per se under either the federal or state Constitutions. We hold that it does not. Instead, we conclude that the nature of the court reporter's duties, peculiar to that officer of the court, makes a prejudicial per se standard wholly inappropriate. Consequently, we shall apply the rebuttable presumption of

prejudice test to this variation on the theme of unauthorized persons in the jury room. Because the uncontradicted showing made below by the People rebuts the presumption of prejudice beyond a reasonable doubt, we shall reverse the lower court's order and remand the case for further proceedings.

## THE DELIBERATIONS AND MOTION FOR NEW TRIAL

We are entirely unconcerned with the facts surrounding defendant's offenses. Suffice it to say that he was accused, and ultimately convicted, of two counts of forcible rape. (Pen. Code, § 261, subd. (2).) During their deliberations, the members of the jury requested a rereading of the testimony of both the defendant and the victim. The trial testimony had been reported by two different court reporters. Pursuant to stipulation by the parties, the reporter who transcribed the victim's testimony and the reporter who transcribed the defendant's testimony were both allowed to go into the jury room to reread the requested testimony. The jurors were admonished by the court that they were not to ask the reporters any questions and that the testimony would be read from beginning to end. The reporter of the victim's testimony was told by the court to read the testimony in full without interruption and not respond to any questions. The victim's testimony was then reread without incident. When Dawn English, the reporter of the defendant's testimony, arrived, she was instructed by the court: "[Y]ou'll not answer any questions from the jury and you will read the entire matter, even if they should ask you at some point in time, you'll read from the beginning to the end."

After Ms. English finally returned from the jury room, defense counsel expressed concern about the length of time it had taken her to complete her task. Defendant's testimony had lasted only about 80 minutes but the reporter had been in the jury room for 3 hours. Ms. English was sworn and testified she read the testimony through without answering any questions but did pause occasionally on the request of the jurors so they could discuss the significance of various bits of testimony. Thus, while she did not participate in the discussions in any way, Ms. English nonetheless had been present in the jury room during a portion of the jury's deliberations. Perhaps reflecting the fact language is not a perfect medium for communication, Ms. English explained she did not understand the court's instruction to read the testimony from beginning to end as an instruction to read it without stopping. Moments after Ms. English left the jury room, the jury voted on the two counts and returned its guilty verdicts.

Defendant moved for a new trial on grounds of jury misconduct, insufficiency of the evidence and impossibility of preparing a record of the

jury's deliberations.[1] (Pen. Code, § 1181, subds. 3, 6 & 9.)   (1) [See fn. 2.] At the hearing on the defendant's motion for a new trial, the prosecution introduced declarations from all of the jurors.[2] The gist of these 12 declarations indicated Ms. English told the jurors on her arrival she could neither answer their questions nor talk about the case. She then commenced reading back the testimony but was slow in doing so. At times she was asked to repeat herself and was not permitted to continue until the jury had discussed the repeated testimony. During these deliberations on the repeated testimony Ms. English said nothing and gave no indication of her thoughts on the matters discussed. At one point Ms. English was asked why she had to come up from Stockton rather than have another reporter read her notes, to which Ms. English replied that each reporter's transcription codes differ. At another point Ms. English was asked if she wanted water or coffee. Ms. English was also asked if she typed the testimony and she answered she did not unless directed by the court to do so. Finally, Ms. English left before the jury took its one and only vote.

The trial court found Ms. English's mere presence during deliberations to be such a departure from established procedures that it constituted a denial of defendant's right to trial by jury. In essence, the court found that this jury and reportorial misconduct constituted prejudicial error per se and granted the motion for new trial on that ground. In the court's view, "[i]t's not a question of presumption [of prejudice] arising" from the unauthorized presence of the reporter during deliberations. Consequently, the court declined to consider the actual showing made by the prosecution to rebut any inference of prejudice. This appeal by the People followed.

---

[1] Like the trial court, we find facetious the defendant's contention he was entitled to a new trial under Penal Code section 1181, subdivision 9, because he was not provided with a transcript of the jury's deliberations. Thus, the trial court did not clearly abuse its discretion in denying a new trial on that ground. The trial court also found that there was sufficient evidence to support the verdict and that finding is not challenged here.

[2] Evidence Code section 1150, subdivision (a), imposes constraints on the impeachment of the jury's verdict: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Under this section "jurors may testify to 'overt acts' — that is, such statements, conduct, conditions, or events as are 'open to sight, hearing, and the other senses and thus subject to corroboration'— but may not testify to 'the subjective reasoning processes of the individual juror . . . .' " (*In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708, P.2d 1260]; citations omitted.) As the affidavits of the jury members in this case recounted only objectively perceived facts and did not in any fashion indicate the subjective deliberative processes of the jury or the effect Ms. English's presence had on that process, they were admissible to rebut the presumption of prejudice. (See e.g., *People* v. *Valles* (1979) 24 Cal.3d 121 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116]; *People* v. *Honeycutt* (1977) 20 Cal.3d 150 [141 Cal.Rptr. 698, 570 P.2d 1050]; *Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388 [185 Cal.Rptr. 654, 650 P.2d 1171].)

## DISCUSSION

██ The People contend that since defendant did not suffer any prejudice from the court reporter's presence in the jury room, the trial court abused its discretion in granting the motion for new trial. Defendant counters by arguing that the invasion of the sanctity of the jury's deliberations constitutes prejudicial error per se. To resolve these contentions we begin by examining the nature of the error and conclude by determining the standard of reversible error governing it.

Both the federal and state Constitutions contain guarantees for the right to a jury trial in criminal cases. (U.S. Const., Amend. VI; Cal. Const., art. I, § 16.) ██ Since "the Fourteenth Amendment guarantees a state criminal defendant the right to a jury trial in any case which, if tried in a federal court, would require a jury under the Sixth Amendment" (*Burch* v. *Louisiana* (1979) 441 U.S. 130, 134 [60 L.Ed.2d 96, 101, 99 S.Ct. 1623]), we examine federal right first.

The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, . . ." Although the Sixth Amendment did not codify the historical features of a jury trial which were merely incidental to its real purpose (*Williams* v. *Florida* (1970) 399 U.S. 78, 102-103 [26 L.Ed.2d 446, 461, 90 S.Ct. 1893]), it does carry with it additional guarantees which are implicit in the nature of a trial by an impartial jury. ██ One of these guarantees is that the jury's verdict must be based upon the evidence adduced at trial uninfluenced by extrajudicial evidence or communications or by improper association with the witnesses, parties, counsel or other persons. "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." (*Turner* v. *Louisiana* (1965) 379 U.S. 466, 472-473 [13 L.Ed.2d 424, 429, 85 S.Ct. 546].) Equally implicit in this constitutional guaranty is the right to have the jury's deliberations conducted privately and in secret, free from all outside intrusions, and extraneous influences or intimidations. As the high court ruled in *Williams,* "[t]he purpose of the jury trial . . . is to prevent oppression by the Government. . . . Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." (*Williams* v. *Florida, supra,* 399 U.S. at p. 100 [26 L.Ed.2d at p. 460].) In

order to facilitate that purpose, along with a number of jurors large enough to promote group deliberation and to provide a fair possibility for obtaining a representative cross-section of the community, the jury's deliberations must be "free from outside attempts at intimidation." (*Ibid.*) "[I]t is the law's objective," the high court declared on another occasion, "to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions purposefully made." (*Remmer* v. *United States* (1956) 350 U.S. 377, 382 [100 L.Ed. 435, 438, 76 S.Ct. 425].)

This isolation from extraneous influences has traditionally been ensured by deliberations which are conducted in private sessions by the jurors alone. As one federal court put it, "a juror should not be subjected to 'extraneous influences' which do or might in any degree coerce, embarrass, or otherwise hamper him in fulfilling his function as a judge of the evidence and finder of fact. A juror must be insulated against influences and protected from pressures that would tend to fetter him in the free exercise of his own judgment. To this end the law requires that all deliberations by a jury must be conducted in the utmost privacy." (*Babson* v. *United States* (9th Cir. 1964) 330 F.2d 662, 665-666, citations omitted.) Just as "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of post verdict scrutiny of juror conduct" (*Tanner* v. *United States* (1987) 483 U.S. 107, 120-121 [97 L.Ed.2d 90, 106, 107 S.Ct. 2739]), so too would deliberations which were not conducted in private. We conclude then that private, confidential deliberations outside of the presence of all nonjurors are an essential feature of the right to an impartial jury trial guaranteed by the Sixth Amendment. An infringement of that essential right therefore constitutes an error of federal constitutional dimension.

■ We also conclude that private and secret deliberations are an essential part of the right to a jury trial under the state Constitution. The California Constitution declares that "[t]rial by jury is an inviolate right and shall be secured to all, . . ." (Cal. Const., art. I, § 16.) "[T]he right so guaranteed, however, is the right as it existed at common law in 1850, when the Constitution was first adopted, . . ." (*C & K Engineering Contractors* v. *Amber Steel Co.* (1978) 23 Cal.3d 1, 8 [151 Cal.Rptr. 323, 587 P.2d 1136]; see *People* v. *One 1941 Chevrolet Coupe* (1951) 37 Cal.2d 283, 287 [231 P.2d 832]; see also *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 828-829 [59 Cal.Rptr. 276, 427 P.2d 988].) Thus the common law right to a jury trial has been enshrined in the California Constitution and remains inviolate.

The word "inviolate," it was early determined, "connotes no more than freedom from *substantial* impairment, . . ." (*People* v. *Peete* (1921) 54

Cal.App. 333, 364 [202 P. 51]; emphasis in original.) Thus, "[t]he cardinal principle is that the *essential* features of trial by jury as known to the common law must be preserved and its benefits secured to all entitled to the right." (*Ibid.;* italics in original.) It is, therefore, the essential or substantial features of a jury trial which are constitutionally protected from impairment.[3] (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 375-376 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233]; *Dorsey* v. *Barba* (1952) 38 Cal.2d 350, 356 [240 P.2d 604].) Among those essential features of the common law jury was the requirement that its deliberations be private and secret. Indeed, common law juries were so completely sequestered that they were virtual prisoners.[4] The privacy of jury deliberations at common law was recounted by Sir Edward Coke in his commentary on Littleton: "By the law of England a jury, after their evidence given upon the issue, ought to be kept together in some convenient place, without meat or drinke, fire or candle, which some bookes call an imprisonment, and without speech with any, unlesse it be the bailife, and with him only if they be agreed." (2 Co.Litt. 227.b.) This common law requirement of privacy has also been explicitly acknowledged by California courts. In *People* v. *Bruneman* (1935) 4 Cal.App.2d 75 [40 P.2d 891], the court recounted the common law rule " 'that the jury are entitled, and bound, to deliberate in private.' " (*Id.,* at p. 80, quoting *Goby* v. *Wetherall,* 2 K.B. 647.) The *Bruneman* court went on to state: " 'When the jury retire from the presence of the court, it is in order that they may have opportunity for private and confidential discussion, and the necessity for this is assumed in every case, . . . The presence of a single other person in the room is an intrusion upon this privacy and confidence, and tends to defeat the purpose for which they are sent out.' " (*Id.,* at pp. 80-81, quoting *People* v. *Knapp,* (1879) 42 Mich. 267 [3 N.W. 927, 929].) This right of private, confidential deliberations, the *Bruneman* court held, " 'goes to the very substance of trial

---

[3] Unlike the Sixth Amendment, the essential elements of the right to trial by jury under the California Constitution also include the requirements that a jury in a felony prosecution consist of 12 persons and that its verdict be unanimous. (*People* v. *Collins* (1976) 17 Cal.3d 687, 693 [131 Cal.Rptr. 782, 552 P.2d 742]; cf. *Williams* v. *Florida, supra,* 399 U.S. at pp. 86-103 [26 L.Ed.2d at pp. 456-461]; *Johnson* v. *Louisiana* (1972) 406 U.S. 356 [32 L.Ed.2d 152, 92 S.Ct. 1620].)

[4] "By the fourteenth century the collective, judicial character of the jury was obviously going to prevail. Although jurors were allowed, even encouraged, to inform themselves before the trial, it became an irregularity to communicate with them once they were sworn other than by giving evidence in open court. If the jurors were spoken to, or treated to food or drink, by either party, their verdict could be quashed. The sequestration of the jury became a principle of paramount importance as improper influences became rife, and it was enforced with such rigidity that its members became prisoners to the court. After the charge, the jurors were confined 'without meat, drink, fire or candle', or conversation with others, until they were agreed; and if they could not agree they were supposed to be dragged round the circuit in a cart till they did." (Baker, An Introduction to English Legal History (2d ed. 1979) The Jury and Pleading, pp. 65-66; fn. omitted.)

by jury.' " (*Id.,* at p. 81, quoting *State* v. *Wroth,* (1896) 15 Wash. 621 [47 P. 106].)

This implicit feature of the right to a jury trial has also found statutory recognition.[5] Penal Code section 1128 directs that "[a]fter hearing the charge, the jury may either decide in court or may retire for deliberation. If they do not agree without retiring for deliberation, an officer must be sworn to keep them together for deliberation in some *private and convenient place, and, during such deliberation, not to permit any person to speak to or communicate with them, nor to do so himself,* unless by order of the court, or to ask them whether they have agreed upon a verdict, and to return them into court when they have so agreed, or when ordered by the court. . . . *The jurors shall not deliberate on the case except under such circumstances."* (Italics added.) Thus by express statutory mandate, as well as by implicit constitutional command, the jurors must conduct their deliberations in private. ■ The presence of the court reporter in the jury room during deliberations consequently violated both the statute and the Constitution.

We turn now to the state and federal standards of reversible error. Article VI, section 13 of the California Constitution provides: "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." In *People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243], the high court phrased the constitutional standard this way: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.,* at p. 836.) But it has long been held that defendants, regardless of their guilt, are entitled to a fair and impartial trial. (*People* v. *Mahoney* (1927) 201 Cal. 618, 626-627 [258 P. 607]; *People* v. *McKay* (1951) 37 Cal.2d 792, 798 [236 P.2d 145].) ■ "The fact that a record shows a defendant to be guilty of a crime does not necessarily determine that there has been no miscarriage of justice." (*People* v. *Mahoney, supra,* 201 Cal. at p. 627.) Consequently, when a defendant has been denied a fair trial or otherwise deprived of some fundamental constitutional right, the error has resulted in

---

[5] Indeed, in California it is a crime for any person to attempt corruptly to influence a juror in his verdict by any extrajudicial communication or document, or by any threat, intimidation, persuasion, entreaty or promise of pecuniary or other advantage. (Pen. Code, § 95.) It is also a criminal offense for any nonmember to listen to the jury's deliberations or to record them. (Pen. Code, § 167.)

a miscarriage of justice even though "an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13) otherwise establishes his guilt. (*People* v. *Mahoney, supra,* 201 Cal. at pp. 626-627; *People* v. *McKay, supra,* 37 Cal.2d at p. 798. See generally, Witkin, Cal. Criminal Procedure (1963) Reversible Error, § 761, p. 733 et seq.) This same construction of the Constitution applies when there has been a substantial abridgment of the right to a jury trial. "It was never intended by this provision of the constitution to take from the defendant in a criminal action his fundamental right to a jury trial or in any substantial manner to abridge this right." (*People* v. *Carmichael* (1926) 198 Cal. 534, 547 [246 P. 62]; see also *People* v. *Werwee* (1952) 112 Cal.App.2d 494, 502 [246 P.2d 704].) In such a case, the error is "in itself a miscarriage of justice within the meaning of article VI, section [13] of the Constitution" and requires reversal without regard to the state of the evidence. (*People* v. *Conley* (1966) 64 Cal.2d 310, 319-320 [49 Cal.Rptr. 815, 411 P.2d 911]; see also *Hernandez* v. *Wilson* (1961) 193 Cal.App.2d 615, 619 [14 Cal.Rptr. 585].) ▮ The question in this case then is whether the presence of the court reporter during a portion of the jury's deliberations amounted to such a substantial abridgment of the right to a jury trial that it constituted a miscarriage of justice without regard to the evidence.

There is little in the way of California precedent on the question of interlopers in the jury room during deliberation.[6] While the case reports evince hordes of unauthorized communicators eager to bend the ears of jurors, blizzards of improperly perused newspaper articles, and legions of juror-Sherlocks eager to unearth the law or facts beyond the record provided them, the participants in this parade of perpetrators of misconduct have almost never seen fit to invade the sanctity of the jury room.

The one exception has been the most likely candidate, that archetypical bridesmaid of a trial by jury, the alternate juror. In *People* v. *Bruneman, supra,* 4 Cal.App.2d 75, the court considered first whether that presence of two alternate jurors in the jury room during deliberations was an invasion

---

[6]There are cases in which nonjurors, for one reason or another, enter the jury room when the jury is not then deliberating. Thus, for example, in *People* v. *Love* (1937) 21 Cal.App.2d 623 [70 P.2d 202], one of the jurors became intoxicated during deliberation. When the bailiff brought this to the court's attention, it summoned a doctor who examined the errant juror in the jury room. After finding the intoxicated juror to be unable to serve, the court excused him and substituted an alternate juror. On appeal from the ensuing conviction, defendant claimed that the doctor and bailiff were unauthorized persons in the jury room making a mistrial mandatory. Noting that there was nothing in the record to indicate that the doctor or bailiff were present while the jury was deliberating, the court held that under these circumstances they were not unauthorized persons present in the jury room. These intrusions, which clearly do not jeopardize the right to a jury trial, pose substantially different problems from those in which an unauthorized person is present during deliberations.

of the right to a jury trial and next whether that invasion was so fundamental that it could not be rendered harmless by the defendant's consent to the procedure. The court answered both questions in the affirmative. It reasoned that the presence of silent alternate jurors must influence the deliberations in a manner which cannot be seen or felt; thus the jury must be considered to consist of more than 12 members. Since the court also concluded the defendant could not consent to any number of jurors other than 12 (a now discredited premise; see Witkin, Cal. Criminal Procedure, *supra*, Trial, § 333, p. 326), it held "that the presence in the jury room of the 'alternate jurors', to whom the case had not been submitted for decision, was an invasion of the defendant's right of trial by jury. And from the same premises we further conclude that this was an error so far destructive to the invaded right, that the error could not by mere consent be rendered harmless." (4 Cal.App.2d at p. 81.) Part of the *Bruneman* reasoning was endorsed by the Supreme Court in *People.v. Britton* (1935) 4 Cal.2d 622 [52 P.2d 217, 102 A.L.R. 1065]. There the trial court, apparently without the consent of the defendant, directed the alternate juror to retire to the jury room with the jury but not to express any opinion or participate by word or action in those deliberations. Agreeing with the conclusion reached in *Bruneman* in the absence of consent, the high court held that " 'the presence of the alternate juror in the juryroom while the jury was deliberating upon its verdict was reversible error.' " (*Id.,* at p. 623.) These decisions were followed in *People* v. *Adame* (1973) 36 Cal.App.3d 402 [111 Cal.Rptr. 462].

So the matter stood until the Supreme Court at last confronted the question of consent in *People* v. *Valles* (1979) 24 Cal.3d 121 [154 Cal.Rptr. 543, 593 P.2d 240, 15 A.L.R.4th 1116]. "The second question [i.e.. whether the stipulated presence of an alternate juror nonetheless constituted prejudicial error] considered by the Court of Appeal in *Bruneman* was not before this court in *Britton* for there is no indication of a stipulation in that case. Considering the question now as a matter of first impression in this court, we conclude the presence of alternates in the jury room during deliberations is not necessarily detrimental to a defendant's right of trial by jury and that defense counsel may stipulate to such procedure." (*Id.,* at p. 125.) The court cited a law review comment critical of *Bruneman* which rejected the notion an extra person in the jury room would invariably inhibit frank and honest discussion through nonverbal communication: " '[T]his reasoning, though it may be valid when the intruder is a total stranger, loses its force when the intruder is an alternate juror chosen in the same way as a regular juror, subjected to the same test of impartiality, and required to possess all the qualifications of a regular juror. There is no reason to believe that the presence of an alternate would in any way restrict honest comment by the jurors or prejudice the defendant.' " (*Ibid.,* citing Comment, *Criminal Law: Alternate Jurors: Substitution After Submission of Case: Presence During*

*Deliberations of Jury* (1936) 24 Cal.L.Rev. 735, 738.) The court noted the alternate should be instructed not to participate in any manner other than by silent attention; were the alternate to cross the line from mere observer to actual kibitzer, the rebuttable presumption of prejudice would attach regardless of the defendant's consent to the procedure. (*Id.,* at p. 128.)

The dissent found no well-reasoned rationale in the majority opinion to depart from that part of the *Bruneman* rule holding that the presence of an alternate juror during deliberations constitutes error with or without defendant's consent. Thus it did not believe the defendant's consent could legitimate the erroneous procedure. Nevertheless, the dissent also rejected the *Bruneman* per se rule of prejudice. "*Bruneman* adopted a per se rule of reversal. Both before and since that time, however, our courts have reviewed a variety of other types of jury misconduct, and in each instance the error has been weighed on the scales of prejudice. The general rule in this state is that a presumption of prejudice arises from jury misconduct. . . . The presumption may be rebutted by proof that no prejudice actually resulted . . . but the effort to do so must be conducted within statutory limitations. . . . [¶] There is no rational reason to distinguish the error involved here from any other case of juror misconduct. I would therefore apply the general rule and hold that a presumption of prejudice arose in the case at bar." (*Id.,* at pp. 131-132 [dis. opn. of Mosk, J.], citations deleted.)

In assessing the propriety of the trial court's application of a prejudice per se standard under the California Constitution, therefore, we must determine if a court reporter is an officer of the court more akin to a stranger (in which case it would seem the *Valles* court indicated the prejudice per se standard of *Bruneman* should be retained) or more akin to the alternate juror (in which case we would apply the rebuttable presumption of prejudice which *Valles* indicates is appropriate). Our analysis of the nature of the court reporter's occupation leads us to the conclusion that while the reporter is not part of the fraternity of jurors as an alternate is, nevertheless the reporter is as inherently nonintrusive as the alternate.

Uniquely among the officers of a court, the court reporter strives to be self-effacing. In the usual course of a reported proceeding, the participants routinely forget there is a human transcriber rather than a tape recorder present (as we are sure most reporters struggling with simultaneous conversations or nonverbal responses or gestures will attest). Alone among court officers, the reporter can be perceived as absolutely neutral with no interest in the outcome nor involvement with the substance of the proceedings. We do not think these professional attributes of invisibility and neutrality are suddenly shed at the door to the jury room. Thus we do not believe jurors will feel inhibited by the presence of the reporter and we certainly do not

believe the reporter will suddenly leap into the role of advocate through either verbal or nonverbal expressions of opinion. If indeed a reporter so forgot the requirements of that office and assumed the mantle of kibitzer, such would be an objectively ascertainable fact recountable through juror affidavits which would create a presumption of prejudice we strongly doubt could be rebutted.

These theoretical ruminations on the effects of the presence of a reporter are borne out by the facts of this case. None of the jurors recounted any reluctance to speak because the reporter was present. Were they uncomfortable deliberating in her presence they simply would have allowed her to read without interruption (as the trial court intended) and then depart. Furthermore, the jurors were unanimous in stating the reporter at no time made any expression of her views on the case. Had she made any nonverbal reactions to the direction of deliberations this surely would have been included in at least one of the affidavits. Therefore, when a court reporter is erroneously privy to jury deliberations under circumstances such as those in this case, the rebuttable presumption of prejudice is the proper standard of prejudice to apply under California law.[7]

We similarly conclude that a reversible error per se standard is not compelled by the federal Constitution. Although we have concluded that the requirement of private deliberation is implicit in the right to trial by an impartial jury under the Sixth Amendment, it does not follow that every infringement of any facet of that right constitutes reversible error per se. The United States Supreme Court has long since rejected the extreme claim that any violation of a federal constitutional right requires automatic reversal. "We are urged by petitioners to hold that all federal constitutional errors, regardless of the facts and circumstances, must always be deemed harmful. Such a holding, as petitioners correctly point out, would require an automatic reversal of their convictions and make further discussion unnecessary. We decline to adopt any such rule." (*Chapman* v. *California, supra,* 386 U.S. at pp. 21-22 [17 L.Ed.2d at p. 709].) As the high court later recounted, the *Chapman* court "recognized that some constitutional errors require reversal without regard to the evidence in the particular case. This limitation recognizes that some errors necessarily render a trial fundamentally unfair. The State of course must provide a trial before an impartial judge, with counsel to help the accused defend against the State's charge. Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no

---

[7] And because the error in this case implicates a federal constitutional right, the presumption must be overcome by evidence which demonstrates that it was "harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

criminal punishment may be regarded as fundamentally fair. Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury." (*Rose* v. *Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 470, 106 S.Ct. 3101], citations and fn. omitted.)

Defendant claims that the court reporter's erroneous presence in the jury room during deliberations is the kind of error which necessarily renders a trial fundamentally unfair and hence requires automatic reversal. In his view, "when the sanctity of jury deliberation is violated, a criminal defendant . . . has not received a fair trial, period." He relies principally upon *Parker* v. *Gladden* (1966) 385 U.S. 363 [17 L.Ed.2d 420, 87 S.Ct. 468]. There, in a per curiam opinion, the high court held that the misconduct of the bailiff, assigned to shepherd the sequestered jury, deprived the defendant of a fair trial. The errant bailiff "stated to one of jurors in the presence of others while the jury was out walking on a public sidewalk: 'Oh that . . . fellow [petitioner], he is guilty'; and on another occasion said to another juror under similiar circumstances, 'If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it.' " (*Id.,* at pp. 363-364, fns. omitted.) Holding that the statements of the bailiff violated the defendant's Sixth Amendment right to trial by an impartial jury and to confront the witnesses against him, the court further concluded that "the unauthorized conduct of the bailiff 'involves such a probability that prejudice will result that it is deemed inherently lacking in due process.' " (*Id.,* at p. 365, citations omitted.) But the egregious misconduct in *Parker* is a far cry from the innocuous presence of the court reporter in this case. No such probability of prejudice arises here. Nor can her silent presence be said to render the trial fundamentally unfair. The United States Supreme Court has emphasized that "while there are some errors to which Chapman does not apply, they are the exception and not the rule. Accordingly, if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless error analysis." (*Rose* v. *Clark, supra,* 478 U.S. at pp. 578-579 [92 L.Ed.2d at p. 471], citations omitted.) Given this admonition, it is clear that the *Chapman* harmless error standard applies to this case rather than the reversible error per se rule.

As our discussion indicates, the uncontradicted showing by the prosecution effectively rebutted, beyond any reasonable doubt, any prejudice to the defendant in this case stemming from the reporter's presence during deliberations. The trial court therefore abused its discretion in granting the motion for a new trial without regard for this showing. (*People* v. *Montgomery* (1976) 61 Cal.App.3d 718, 728-729 [132 Cal.Rptr. 558].)

The order granting a new trial is reversed and the cause remanded to the trial court with directions to enter a new and different order denying that motion and thereafter to proceed according to law.

Puglia, P. J., and Sims, J., concurred.

A petition for a rehearing was denied December 15, 1987, and respondent's petition for review by the Supreme Court was denied February 18, 1988.