[No. D046614. Fourth Dist., Div. One. Sept. 7, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MATTHEW RAY BRADFORD, Defendant and Appellant.

COUNSEL

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—

I.

INTRODUCTION

Defendant Matthew Ray Bradford appeals from a judgment of conviction and sentence. A jury found Bradford guilty of second degree murder, and found true the special allegations that he personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally used and discharged a firearm causing great bodily injury or death. The trial court sentenced Bradford to an aggregate term of 40 years to life.

On appeal, Bradford raises 10 claims challenging the judgment of conviction and sentence. Bradford contends that (1) the trial court erred in instructing the jury on the element of malice required for second degree murder, and in particular, that the court's supplemental instructions were not balanced because they did not include a reminder that the prosecution bears the burden to prove beyond a reasonable doubt the absence of provocation and/or imperfect self-defense; (2) the trial court impermissibly intruded on the jury's

deliberative process by interacting with the jury; (3) the trial court's unrecorded interactions with the jury left Bradford with an inadequate record on appeal, thereby preventing him from receiving meaningful appellate review of the judgment; (4) he cannot be convicted of murder because the information failed to allege malice, which, Bradford contends, is an essential element of murder; (5) the court erroneously instructed the jury that it could not return a verdict finding Bradford guilty of voluntary manslaughter unless it first acquitted Bradford of murder; (6) the court erroneously instructed the jury on manslaughter by repeatedly discussing the offense in terms of "reducing" a homicide from murder to manslaughter; (7) the court erroneously instructed the jury as to the burden of proof pertaining to the use of circumstantial evidence to prove the existence of an exculpatory mental state present in self-defense; (8) the trial court should not have excluded defense evidence of the victim's "character trait for violence"; (9) the cumulative effect of the trial court's errors requires reversal of the conviction; and (10) the trial court erred in failing to strike the Penal Code section 12022.5 firearm enhancement.

We conclude that the trial judge's act of engaging in private, unrecorded discussions with the jurors while the jury was deliberating was highly improper and requires reversal of Bradford's conviction. In entering the jury room during deliberations and engaging in off-the-record discussions with the jurors concerning points of law applicable to the case, the judge violated Bradford's right to have his counsel present during a critical stage of the proceedings. The judge's unorthodox method of responding to the jury's inquiries also infringed on the jury's deliberative process, thereby violating Bradford's right to trial by jury. Because there is no record of the trial court's interactions with the jury, and the judge cannot recall precisely what was said during those interactions, the record is insufficient to enable this court to conduct meaningful appellate review of the effect of the error. We must therefore reverse Bradford's conviction and remand the case to the trial court for a new trial.

Our conclusion that we must reverse Bradford's conviction based on the trial judge's improper interactions with the jury obviates the need to address many of Bradford's remaining assertions of error. However, we do consider and reject two of Bradford's other claims, because they raise issues that are likely to recur on remand.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 17, 2004, the People filed an amended information charging Bradford with the murder of Pedro Lopez, in violation of Penal Code[1] section 187, subdivision (a). The information also alleged that during the commission of the offense, Bradford personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)), personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and personally and intentionally used and discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). The information further alleged that Bradford committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

On August 27, 2004, a jury found Bradford guilty of second degree murder. The jury found true the allegations that Bradford personally used a firearm, personally and intentionally discharged a firearm, and personally and intentionally used and discharged a firearm causing great bodily injury or death in committing the murder. The jury did not find true the special allegation that Bradford committed the murder for the benefit of a criminal street gang.

On November 10, 2004, the trial court sentenced Bradford to an aggregate term of 40 years to life. The sentence included a term of 15 years to life for the second degree murder conviction, and 25 years to life, consecutive, for the enhancement for intentionally and personally discharging a firearm. The court stayed imposition of sentence on the remaining firearm enhancements, pursuant to section 654.

On June 13, 2005, Bradford moved to have his notice of appeal deemed timely filed under a theory of constructive notice of appeal. On June 17, this court granted the motion and ordered the notice of appeal filed as of the date of this court's order.

*Factual background*

1. *The prosecution's case*

On the evening of Saturday, October 31, 2003, Princess Lopez[2] hosted a Halloween party at her family's home. Princess's boyfriend, Jorge Prado,

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

[2] We will refer to Princess Lopez by her first name to avoid confusion between her and the victim, Pedro Lopez. Princess and Pedro Lopez were not related.

invited Bradford to the party. Prado testified that at that time, he and Bradford were members of the Up In Smoke gang. Prado knew that Princess's brother Rudy was a member of the Sherman gang. Prado was also aware that Rudy and Bradford had been involved in a fistfight with each other a few months prior to the party. Princess stated that Bradford and approximately five other Up In Smoke gang members had beaten up Rudy sometime during the summer of 2003.

Bradford arrived at the party at approximately midnight and stayed until 3:00 a.m. on November 1. Three or four members of the Sherman gang, including the victim, Pedro Lopez, were at the party. Prado and Princess recalled that everyone, including Bradford, appeared to be enjoying themselves at the party.

At some point during the night, Prado saw Bradford, Lopez, and another Sherman gang member talking with each other in the front yard of Princess's home. Lopez and the other man were speaking to Bradford in loud voices, and Bradford was responding. Prado saw one of the two other men strike Bradford in the face with a fist, and witnessed Bradford fall to the ground as a result of the strike. Prado did not see either man hit or kick Bradford again, nor did he see Lopez or the other man display a weapon.

When Prado saw the members of the Sherman gang punch Bradford, he anticipated that he and Bradford would engage in a fistfight with them. Prado was surprised to see Bradford pull a black semiautomatic handgun from his waistband as he got up. Prado heard someone say, "If you are going to pull it, pull it," and then saw Bradford shoot at Lopez and the other man. Once Bradford began shooting, Prado started to run toward a gate on the property that led to the street. As he ran, he felt something strike him. He "stopped for a minute" and then continued running away from the scene. Prado suffered a gunshot wound to the stomach.

Bradford also ran from the scene. He caught up with Prado and helped him move. Bradford apologized to Prado for having shot him. After a short time, the two split up and ran in different directions.

Prado knocked on the door of a nearby home and asked the resident to call an ambulance for him. The resident saw that Prado had an injury near his stomach and called 911. Prado told the resident that he had been walking down the street when "some homies pulled up and shot him." Prado was taken to the hospital where he was treated overnight and released.

Princess was inside her house when she heard gunshots. She went outside after the shooting stopped and saw Lopez holding his chest and yelling that he had been shot. Princess did not see Prado or Bradford outside.

Police officers responded to the shooting and found Lopez bleeding from a gunshot wound. Officers found three expended .40-caliber shell casings in the front yard of Princess's home. The parties stipulated that Lopez was taken to the hospital on November 1, 2003, received emergency surgery, and died 11 days later.

At trial, both Prado and Princess admitted that they had initially lied to investigating officers. Prado told the officers that three Hispanic males had driven up near him, challenged him about his gang membership, and shot at him. Princess told the investigating officers that two Black males had run by and that she would not be able to identify them. Prado also admitted that he lied at Bradford's preliminary hearing when he testified that he did not know who Rudy was. Prado stated that he had been trying to prevent Rudy from becoming involved in the case. However, Prado said that he was telling the truth during his testimony at trial.

Police officers arrested Bradford at his aunt's apartment in El Cajon. After obtaining the aunt's consent to search her apartment, police found a red backpack and a sketch of a handgun with the word "revenge" written under it. A gang expert testified that the Up In Smoke organization is a street gang and opined that Bradford shot at the Sherman gang members, at least in part, to gain respect for Up In Smoke, and to increase his standing in the organization. The expert also testified that Bradford had been sending letters from jail in which he requested that the recipients harm certain individuals. According to the expert, these letters contained gang language.

### 2. *The defense*

At trial, Bradford admitted that he was a member of the Up In Smoke organization, but asserted that the sole purpose of the organization was "to tag and get up tagging," i.e., "to gain more skills than somebody else in art, drawing characters and drawing letters and stuff."

According to Bradford, after he arrived at Princess's party, four or five individuals introduced themselves to him as members of the Sherman gang. Bradford had not met any of these people before. However, a few months earlier, Bradford had engaged in a fistfight with Princess's brother Rudy at an adjacent apartment complex. Bradford testified that he and Rudy later discussed the incident and that "it was over with." Bradford had not been concerned that his fight with Rudy would cause trouble for him at Princess's party.

During the two or three hours he was at the party, Bradford drank one wine cooler and talked with people. As the party appeared to be coming to an end,

Bradford went outside to smoke a cigarette. Three Sherman gang members who were at the party, including Pedro Lopez, approached him and asked him about his fight with Princess's brother. The Sherman gang members "were getting mad because it was answers they didn't like." They started to raise their voices. After a few minutes, one of the men struck Bradford in the face. As he was falling, he was struck again on the back of the head. At that point he was "shocked" and "scared." Bradford "got up and pulled out a weapon and . . . shot."

Bradford said that he had not had the gun in his possession all evening, but rather, that he had retrieved the gun from a nearby gutter only a few minutes before he was punched. Bradford explained that "somebody [he] knew keeps weapons around, close at hand."

Bradford testified that he pointed and shot the gun in the direction of the Sherman gang members, but that at the time, he did not know whether he had hit anyone. He said that he shot the gun to scare the gang members away, and that he did not intend to kill anyone. Bradford thought he had fired the gun only two times, but acknowledged that police had found three shell casings. Bradford admitted that he accidentally shot his friend, Prado. After Bradford fired the gun, he and Prado ran from the area.

Bradford repeatedly apologized to Prado as he helped Prado run away from the scene of the shooting. At some point, Prado and Bradford parted company. Bradford threw the gun's magazine under a car and threw the gun under another car as he walked to his aunt's home.

Bradford denied that the letters he sent from jail contained street gang language. He also denied that his letters directed Up In Smoke members to harm anyone.

## III.

## DISCUSSION

A. *The trial court's unrecorded ex parte communications with the jury while the jury was deliberating require reversal*

1. *Additional background*

The jury began deliberating on August 25, 2004, at 1:00 p.m. Just before noon on August 26, 2004, the jury foreperson sent the court a note that stated, "We are a hung jury." Judge John Thompson met with counsel to discuss the note. Judge Thompson then engaged in a recorded conversation with the jury

foreperson, in the presence of counsel, but outside the presence of the other jurors. During that discussion, the foreperson indicated that the jury was split six to six on the first degree murder charge, and that it was "possible instruction from the court would solve the impasse." The foreperson told Judge Thompson that the jury was having a problem with "[t]he definition of intent as it applies in this case, particularly express intent," and whether the jury was to "apply [the reasonable person standard] as ourselves or as a gang member." Judge Thompson directed the foreperson to return to the jury room and have the jury formulate a written question for the court. The foreperson returned to the jury room. Judge Thompson and the attorneys[3] then discussed what the foreperson had said, and also discussed scheduling problems that some of the jurors had.

 a. *The first unreported interaction*[4]

At 12:43 p.m. on August 26, the jury foreperson sent the court a note. After receiving the note, the court conferred with counsel concerning the content of the note and how the court should respond to it. The following colloquy occurred between Judge Thompson and the attorneys:

"The Court: 'We require further clarification of express malice, including specific examples which define intention at the time the act was committed.' [¶] *I have no problem going in there and giving them what we talked about as an example of express malice.* I'm not sure I can think of another. [¶] How about you, Annette?[5] (Italics added.)

"Mr. Edwards: No.

---

[3] Bradford waived his right to be present when the court and counsel considered jury questions and how to respond to them.

[4] In October 2005, in order to provide a more complete record for appeal, Bradford's appellate counsel applied in the trial court for permission to prepare a settled statement regarding the unreported communications Judge Thompson had with the jury during deliberations. The settled statement clarified a few confusing items in the record concerning interactions that are identified in the record as six "unreported oral proceedings." The settled statement establishes that the proceedings referred to as the "second unreported oral proceeding" and the "third unreported oral proceeding" were in fact the same unreported oral proceeding. It also establishes that the "fourth unreported oral proceeding" was a proceeding that was held in open court, and that the proceeding was recorded, although counsel were not present. We will refer to the various interactions as they appear in the record so that the final unreported proceeding will be identified as the "sixth unreported interaction," even though later clarifications establish that one proceeding was counted twice, and that another was counted as "unreported" but was, in fact, reported. We have taken our descriptions of what took place while the jury was deliberating from the trial transcript, the clerk's record, and the information contained in the settled statement.

[5] Judge Thompson was addressing this question to the prosecutor, who is identified in the transcript as "Ms. Irving." Defense counsel is identified in the transcript as "Mr. Edwards."

"Ms. Irving: No. The court's example was 'I'm going to get this gun.'

"The Court: He says that. He's got to vocalize it. He has to express it. [¶] If he had said to Prado 'I'm going back to the car. I'm going to get the gun and I'm going to whack this Sherman punk,' to me that's express malice. He's expressing what he's going to do. [¶] Simply going back and getting the gun, saying to Prado, 'I'm going to get the gun,' goes and gets the gun, comes back and shoots the Sherman dude, that's not express malice. It's implied malice. He's doing an act that is reasonably foreseeable. Shoot a gun at someone. Am I wrong?[6]

"Mr. Edwards: There's an intervening factor?

"The Court: You should be shutting up. They are not going to be able to find express malice. He never says this. [¶] I don't think Annette, in her wildest dreams, would have thought this was going to be an issue. He doesn't express any malice at the time he does the act. She never even argued it.

"Mr. Edwards: Get in there and tell them that.

"The Court: I can't think of another example of what express malice is. [¶] Can you?

"Ms. Irving: No.

"The Court: Let me check one more time.

"Ms. Irving: Was there a question about the reasonable gang member?

"The Court: Here's what it says. 'We require further clarification of express malice, including specific examples which define intention at the time the act was committed.' [¶] I'll give them an example of express malice, and that's it. And then I'll come back and type what it [sic] said and put it in as part of the record if I have got your authority to do that.

"Ms. Irving: Yes.

"Mr. Edwards: Yes."

Judge Thompson then entered the jury room alone, without a court reporter, while the attorneys remained in the courtroom. When Judge Thompson came

---

[6] As becomes apparent later in the proceedings, the judge's statements concerning express and implied malice are inaccurate statements of the law.

out of the jury room and reentered the courtroom, the jurors remained in the jury room, presumably to continue deliberating. Judge Thompson discussed with the attorneys what had occurred in the jury room:

"The Court: Let me tell you what's going on. They are firing questions. I said, 'You've got to put them in writing.' [¶] They were under the impression that to find murder in the first, they must find express malice. That is incorrect. They can find either express malice or implied malice for malice aforethought. I went ahead and told them—I hope it's okay. I said, 'But for a first-degree murder, it isn't the issue of express or implied malice. You have to be able to find premeditation and deliberation. If you can't find those, it's not a 1.' That's a correct statement of the law.

"Some gal who is the instruction girl is flying through the—[the] foreperson is not the instruction person. The foreperson is doing questions. The instruction person is flipping through the instructions.

"She starts talking. I said, 'No. You've got to put it in writing.'

"We are going to get another question back from them on the issue. I think the other is not—I gave them the example of express malice. I said, 'Express wasn't argued by either side. It wasn't there.['] It's a great implied malice case, but it certainly isn't an express malice case. . . .[7]

"I think—they felt the only way they could get to 1 was express malice, which makes me think there are six that believe there is express malice—they have no idea what express malice is—and there are six that believe it was implied malice.

"Mr. Edwards: You argued that. I just left that one alone.

"The Court: Argued what?

"Mr. Edwards: She argued to get to first, you have to have express. [¶] Am I wrong?

"Ms. Irving: I don't think I did.

"Mr. Edwards: That's what I heard. I just—

---

[7] The settled statement clarifies that although the reporter's transcript indicates that Judge Thompson made the statement to the jury, "It's a great implied malice case, but it certainly isn't an express malice case," he did not in fact say this to the jury, but rather, made this comment to counsel. The altered punctuation in this quotation reflects the settled statement's clarification of the matter.

"The Court: I'm not wrong. You can have either. What you need is malice aforethought. Malice aforethought can be either express or implied. Either theory gets you there. [¶] But malice aforethought generally isn't the issue in a 1 versus a 2. It's premeditation and deliberation.

"Mr. Edwards: That malice instruction is so confusing.

"The Court: Gary, I'm not in any way defending these instructions. As I said, it's a joke. When it gets really bad is when you do those ridiculous conspiracy instructions. I don't know how anyone ever understands what's going on there.

"Ms. Irving: The way the court responded, then was that either express or implied can be used when they are deliberating over a first?

"The Court: Frankly, I made them read the elements of murder; 1, 2, and 3. Then I said, 'You make the determination.' You [*sic*] said, 'There's these two things. It's either[/]or. You don't have to have express malice for murder 1.' That was the question they asked. That was answered. [¶] I presume they are going to have another question come out. It doesn't take care of our problem [regarding a juror's potential scheduling conflict]. I did not talk to the gal, Gary. I'll do that before I cut her loose. Maybe they want to—maybe a combination of your guys' idea is what we do. Put the alternate in and make them start to deliberate again. You know, I'm going to tell them not to refer to it. What a joke. They will start right where they left off probably."

Judge Thompson and the attorneys continued to discuss various hypothetical situations involving what the court believed constituted examples of "express malice," and then discussed an issue that had previously been raised about whether an alternate juror would be sworn to take the place of a juror who had a scheduling conflict. Judge Thompson never prepared a written record of what he said to the jurors or what they said to him during this first unreported proceeding.

b. *The second unreported interaction*

As this conversation between Judge Thompson and the attorneys came to a conclusion, Judge Thompson noted that it was presently a half-hour past the promised 1:00 p.m. lunch break for the jury, and that the jury had neither indicated a desire for a break, nor sent out another question. Although the jury had not indicated that it required assistance from the court, the court bailiff asked the judge, "Are you going in?" Judge Thompson replied, "I'd better go in," and entered the jury room, without a court reporter, after recessing the court proceedings. When Judge Thompson returned to the

courtroom, he went on the record and told the attorneys, "They are talking. I'm going to leave them in there. [¶] I want you guys to hang around, of course." The court then recessed again.

At the hearing to settle the record, Judge Thompson recalled that upon entering the jury room the second time, he "asked the jury foreperson whether deliberations were continuing." The jury foreperson indicated that the jury wanted to continue deliberating, so Judge Thompson left the jury room "without comment."

In the settled statement, the parties agreed that this unreported proceeding was the same proceeding that is identified in the clerk's transcript as a third unreported proceeding that occurred at 1:50 p.m. on August 26, 2004. With regard to this event, the clerk's transcript provides: "The Court enters the jury room and again inquires of the presiding juror. The jury asks the Court to exit."

### c. The fourth "unreported" interaction

A clerk's minute order indicates that Judge Thompson entered the jury room at 3:00 p.m. on August 26 and instructed the jury with CALJIC No. 17.51. It appears, however, that the judge did not in fact enter the jury room at 3:00 p.m. that afternoon. Rather, he instructed the jurors in open court, on the record, albeit without counsel present.[8] The reporter's transcript provides: "The Court: The record will reflect all members of the panel are present, including an alternate, alternate no. 1, that's now been seated. [¶] Members of the jury, a juror has been replaced by an alternate juror. You must not consider this fact for any purpose. The People and the defense have the right to a verdict reached only with the full participation of the 12 jurors who return the verdict. This right may be assured only if you begin your deliberations again from the beginning. [¶] You must, therefore, set aside and disregard all past deliberations and begin deliberating anew. This means that each remaining original juror must set aside and disregard earlier deliberations as if they had not taken place. [¶] You shall now begin anew your deliberations in accordance with the instructions previously given."

### d. The fifth unreported interaction

The following day, August 27, the jury sent the court another note. In the presence of counsel, Judge Thompson stated on the record, "The record will reflect the following note was received: One, willful; two, deliberate; three[,]

---

[8] The record suggests that counsel was aware that the court was going to instruct the jury regarding the replacement of a juror.

premeditated, do all three conditions have to exist to find murder in the first? That's question number one. [¶] Question two: Does 'willful' mean that the act was an intent to kill, or simply—I think that should be intentional act—'that resulted in the death?' " (Internal punctuation as in original.) Judge Thompson discussed with the attorneys how he should respond to the jury's questions. Judge Thompson concluded, "It seems to me the answer to the question number one is: Yes, you need—the act has to be willful. There has to be deliberation and premeditation for a 1. [¶] Does anyone disagree with that?" Neither attorney disagreed. Judge Thompson continued, "So I think the answer to question one is: Yes. And question number two, we'd also refer them to 8.20 where it defines willful."

The prosecutor then asked Judge Thompson to explain to the jurors that either "express or implied malice can be used in arriving at a [conviction of] first degree murder." Judge Thompson declined the request because he believed he had already given that instruction. The following colloquy then occurred:

"The Court: Every murder, a 1 or 2, requires malice aforethought. The distinction between a 2 and 1 is premeditation and deliberation. That's what makes a 2 a 1. Without those two elements, malice aforethought, intent to kill, equals a 2.

"Mr. Edwards: Just a yes [in response to question one] and refer to [instruction 8.20 in response to question two].

"The Court: Yes, and I'm going to have them look at 8.20. Is that all right?

"Mr. Edwards: Yes."

The court then recessed, and Judge Thompson entered the jury room, without a court reporter, to answer the jury's questions. The record does not indicate that Judge Thompson asked the attorneys whether they approved of him entering the jury room again to respond to the jury's questions, rather than bringing the jury into the courtroom.

After Judge Thompson came out of the jury room, he engaged in the following colloquy with the attorneys:

"The Court: Their question is an interesting one. They really don't know what they are asking, but they collectively know exactly what they are feeling. [¶] They want to know whether or not Bradford needs to have an intent to kill. They are concluding that he takes that gun out and starts firing at these guys with the intent to injure them seriously, whatever. Okay. Now,

when you look at the definition of murder, the answer to that question at first blush is: No, because all you need is that a human being was killed, the killing was unlawful, and the killing was done with malice aforethought. [¶] Now, I didn't say no, you don't need an intent to kill. I didn't say that. I said you have to review all the instructions. [¶] When you look at malice aforethought, to get implied malice, all you needed was the killing resulted from an intentional act, the shooting, the natural consequences of the act were dangerous to human life. The brightest person in there is this new alternate. You can just tell. She's asking some very interesting questions. And three, the act was deliberately performed, dangerous. All that's true. Bradford fits all those criteria. So there's implied malice. [¶] Their question is: Does a murder 1 require an intent to kill? [¶] Now, if they come back with that particular question, my answer is going to have to be: No, it does not require an intent to kill. Because to get to a 1, all you need is malice aforethought.

"Mr. Edwards: Premeditation.

"The Court: Premeditation and deliberation, that a dude was killed with malice aforethought, done by an intentional act.

"Ms. Irving: My sense of the question, handwritten question, sort of alludes to that.

"The Court: Sort of alludes to it doesn't count.

"Mr. Edwards: Things aren't looking too good here.

"The Court: Not looking too good. Looks like they are looking every which way they can to find a 1 on this guy.

"Ms. Irving: Did the jury pose that question, then?

"The Court: Not really. Any question, whatever they are saying, I refused to answer it. They can pose a different question. [¶] We'll wait for their next question."

At the hearing to settle the record, Judge Thompson attempted to recall what had occurred in the jury room:

"[What occurred was] a combination, as I recall, of two things happening. Them asking the specific—a request in the[re] of me. I do remember this question being asked. I think I went in and I gave them the definition of willful. I probably read additional instructions with regard to malice and the murder count.

"I do remember them posing the question, something to the effect of as to [*sic*] whether or not Bradford needed to have the intent to kill to be convicted of murder.

"With that question in mind, I thought we came back out and discussed it further, either in chambers or on the record out here. But I certainly didn't—the next—the point I'm making is that the next sentence, 'They are concluding that he takes the gun out, starts firing at these guys with the intent to injur[e] them seriously, whatever, okay.' That statement, that was not made to the panel. The panel did not make that statement to me. That was my own supposition that I made to counsel. I said this is what I guess they are trying to say based upon the statement that they had made.

"This was not a quote of any particular jur[y] member as to what they were thinking. This was my inference, good, bad or indifferent, based upon what they had said."

With regard to the instruction regarding the term "willful," Judge Thompson did not remember whether he had read from "an original instruction" or whether he "pulled out . . . CALJIC and read it out of there." He also did not recall whether he told the jury to "look at [CALJIC] No. 8.20," as he had said he was going to do before he entered the jury room.

### e. *The sixth unreported interaction*

At 2:15 p.m. on August 27, Judge Thompson went back on the record in the presence of counsel. The attorneys had come to him earlier, after realizing that the instructions the court had given to the jury regarding express and implied malice were incorrect. Judge Thompson indicated that after the attorneys brought the erroneous instructions to his attention, he once again entered the jury room, at 2:08 p.m. on August 27, and spoke to the jury without the attorneys, defendant, or a court reporter present, to attempt to properly instruct the jury on the law pertaining to murder. According to the clerk's minute order from that day's proceedings, Judge Thompson "advise[d] the jury that if they find only that there was implied malice, they can only find murder in the 2nd degree. If they find express malice applies, they can then find 1st degree murder."

Judge Thompson described on the record what had occurred after the attorneys realized that the instructions the court had given concerning malice were incorrect and brought the error to his attention:

"The record will reflect that both counsel, having met outside the presence of the court, came to the conclusion that possibly the court had misinterpreted the law in this case and provided the jury with inappropriate instructions.

"Ms. Irving did some additional research over the noon hour and concluded that our interpretation of 8.20 and responses to questions may have

been inappropriate. We discussed the matter in chambers. The court concluded that counsels' assessment of the situation was accurate.

"Based upon the questions that had been posed by the panel yesterday, it was the court's opinion that erroneous instructions had been provided by the court on the issue of express malice and/or implied malice.

"Ms. Irving indicated and pointed out to the court that you could not get to a first-degree murder without proof of express malice aforethought. She suggested that express malice includes not only a manifest intention to kill by way of a statement, something to the effect 'I'm going to kill,' but you could infer from the circumstances surrounding the commission of the act that one is manifesting an express intent to kill or, in essence, express malice aforethought. But she pointed out that they cannot get to a 1 with an implied malice theory.

"Having run this problem by Mr. Edwards, of course, he was in full agreement. Both of them came to me. *And based upon that, I went into the jury room, advised the panel that some of the instructions or answers to their questions of yesterday may have been inaccurate. And we indicated—I indicated to them that they could not reach a 1 without express malice aforethought. They could reach express malice aforethought or come to that conclusion not only with an explicit statement 'I'm going [to] kill you,' but I also advised them they could infer from the circumstances, if they so believed, that there was an express intention to kill without words to suggest that. But they could reach the idea of express malice aforethought that way.*

"*Obviously, I told them they didn't necessarily have to find that. It was one of the options.*

"*What I did tell them was they could not come back with a 1 under an implied malice theory. The law does not allow that. One of the panel members began erasing certain things on the board that were clearly an improper statement of the law. I indicated that with those modifications to the chart they were using, they then had a correct statement of the law, and I left. That's what took place.*

"We'll see what they do." (Italics added.)

At the hearing to settle the record, Judge Thompson stated that he "went in there, advised the panel, which I do recall doing, that some of the instructions and answers that I had provided to their questions might have been inaccurate. I do remember saying that. [¶] I do recall that we corrected the issue on first degree." However, Judge Thompson acknowledged that he could not

remember exactly what he had said to the jury. He did not recall which specific instructions he had told the jury to disregard, or which instructions he had informed them were incorrect. He also could not remember precisely how he informed the jury that some of the court's prior answers to the jury's questions may have been incorrect. When asked whether the jury had asked about, or requested, further instruction on implied malice, Judge Thompson responded, "Steve, I don't remember anything. And a lot of it is being triggered by your last paragraph here. I don't know if you want to get it to [*sic*] yet."

The judge's comment was a reference to the jury's use of a dry erase board while Judge Thompson was present in the jury room. With respect to the writings on the board, Judge Thompson stated, "[W]e have a big easel in there—we have a big white board where you can put the ink on and erase it. They had something on there like 'express malice' or 'first-degree murder.' I don't remember what it was. Then they had the words 'I'm going to kill you.' Exactly what I had said. And one of the panel members got up and erased that. Once that was gone and they had express malice, as to the other alternate methods of getting to express malice up there, it appeared to me that that was a correct statement of the law."

When asked if "that's what [he] told them [i.e., that the statement on the board was a correct statement of the law]," Judge Thompson replied, "That's what I told them. Once they had erased my 'I'm going to kill you' statement."

## f. *The verdict*

At 2:28 p.m. on August 27, the jury informed the court that it had reached a verdict. The jury found Bradford not guilty of first degree murder, but guilty of second degree murder. The jury also found true all three of the firearm enhancements. The jury did not find true the allegation that Bradford committed the crime for the benefit of a criminal street gang.

## 2. *The trial judge's interactions with the deliberating jury were highly improper*

### a. *Bradford has neither waived nor forfeited this claim*

The People contend that Bradford should be precluded from arguing that the trial court erred in entering the jury room because prior to Judge Thompson's first unreported interaction with the jury, Bradford's attorney approved of Judge Thompson's suggestion that the judge enter the jury room

to answer the jury's questions and/or because defense counsel failed to object to the court's conduct. We disagree.

### i. *Bradford did not waive this claim*

 It is not clear that defense counsel, through his personal conduct in the absence of the defendant, can "waive" his client's right to have counsel present at all critical stages of the proceeding or the client's right to trial by jury: " 'Counsel may waive all but a few fundamental rights for a defendant.' [Citation.] . . . ' ". . . By choosing professional representation, the accused surrenders all but a handful of 'fundamental' personal rights to *counsel's* complete control of defense strategies and tactics." ' [Citation.] Included in that narrow exception are such fundamental matters as whether to plead guilty, *whether to waive the constitutional right to trial by jury, whether to waive the right to counsel*, and whether to waive the privilege against self-incrimination. [Citation.] 'As to these rights, the criminal defendant must be admonished and the court must secure an express waiver; as to other fundamental rights of a less personal nature, courts may assume that counsel's waiver reflects the defendant's consent in the absence of an express conflict.' [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 873–874 [38 Cal.Rptr.3d 149, 126 P.3d 981], second italics added.)

 The right to counsel is the right to be represented by counsel "at all critical stages of the prosecution" (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001 [47 Cal.Rptr.3d 467, 140 P.3d 775]). Jury instruction is a critical stage of the proceedings. (*People v. Dagnino* (1978) 80 Cal.App.3d 981, 985–988 [146 Cal.Rptr. 129] [court's sending written instructions to jury during deliberation is critical stage].) There is nothing in the record that indicates that Bradford waived his right to have his counsel present at all times while the court was instructing the jury.

 Bradford's challenge to the trial judge's conduct also implicates an essential feature of the right to trial by jury, i.e., the free and private exchange of views among the jurors during deliberations. Bradford asserts that the judge improperly intruded into the jury's deliberative process. There is nothing in the record to suggest that Bradford personally waived his right to have the jury deliberate without intrusion. We therefore reject the People's argument that Bradford should be barred from raising on appeal any complaint about the trial judge's conduct based on defense counsel's initial approval of the judge's suggestion that he enter the jury room to answer the jury's question concerning express malice.

Even assuming that Bradford's attorney had the authority to waive these aspects of Bradford's right to counsel and jury trial, it is clear from the record

that the judge exceeded the scope of any purported waiver. Despite the fact that Judge Thompson told counsel that he intended only to provide the jury with "an example of express malice," before his first unreported exchange with the jury, once in the jury room, the judge admittedly did more than simply give the jury an example of express malice. Additionally, apart from acquiescing in the judge's plan to provide the jury with an example of express malice, the record does not demonstrate that counsel affirmatively authorized the judge to engage in other unreported communications with the jury, and the judge never requested additional authorization or consent from counsel to enter the jury room. Rather, the judge appears to have made a unilateral decision to go into the jury room multiple times to respond to the jury's questions.

### ii. *Bradford did not forfeit this claim*

Bradford's contentions pertaining to the trial judge's conduct implicate fundamental rights, including the right to the assistance of counsel, and the right to trial by jury, as we discuss further in part III.A.2.b., *post*. "A defendant is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights. [Citations.]" (*People v. Vera* (1997) 15 Cal.4th 269, 276–277 [62 Cal.Rptr.2d 754, 934 P.2d 1279].) The fact that Bradford's counsel did not register an objection to Judge Thompson repeatedly entering the jury room, alone, to further instruct the jury, does not preclude Bradford from challenging the trial court's conduct on appeal.

Further, even assuming that Bradford forfeited his right to challenge the judge's conduct on appeal through his counsel's failure to object, it is still within our discretion to consider the claim. (See *People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429] [an appellate court is "generally not prohibited from reaching a question that has not been preserved for review by a party"].) In view of the seriousness of the error, even if we presume the issue has not been properly preserved, we would exercise our discretion to consider Bradford's claim on its merits.

### b. *The judge's entering the jury room and engaging in unreported communications with the jury concerning issues of law relevant to the case constitutes error*

The United States Supreme Court has cautioned: "Any *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. . . . [E]ven an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise. . . . [I]t is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can

generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements." (*United States v. United States Gypsum Co.* (1978) 438 U.S. 422, 460 [57 L.Ed.2d 854, 98 S.Ct. 2864].)[9]

██ Because of these obvious dangers, ex parte communications between a trial judge and a deliberating jury are prohibited both by California case authority and by statute. "[I]t has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel." (*People v. Hogan* (1982) 31 Cal.3d 815, 848 [183 Cal.Rptr. 817, 647 P.2d 93] (*Hogan*), disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]; see also *People v. Knighten* (1980) 105 Cal.App.3d 128, 132 [164 Cal.Rptr. 96] [stating that trial judge's entering jury room during deliberations without a court reporter or counsel, "ostensibly to clarify a request from the jury for rereading of certain testimony" was "[u]nquestionably" error and holding that "[a]ny private communication between judge and jury is improper"].) This rule is codified in section 1138, which provides: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

" 'In the discharge of his official duty the place for the judge is on the bench. As to him the law has closed the portals of the jury room and he may not enter.' " (*People v. Bruneman* (1935) 4 Cal.App.2d 75, 81 [40 P.2d 891], overruled on other grounds in *People v. Valles* (1979) 24 Cal.3d 121, 127 [154 Cal.Rptr. 543, 593 P.2d 240], quoting *State v. Wroth* (1896) 15 Wn. 621, 623 [47 P. 106] (*Wroth*), overruled on other grounds in *State v. Caliguri* (1983) 99 Wn.2d 501, 508–509 [664 P.2d 466].)[10]

---

[9] While the *Gypsum* court's comments pertain to ex parte discussions between a trial judge and a jury foreperson, the reasoning applies with equal force, or perhaps more so, to a situation where, as here, the judge engages in private communications with the jury as a whole.

[10] In *Wroth*, the judge went into the jury room in response to a request from the jury, "and received from them some communication." (*People v. Bruneman, supra,* 4 Cal.App.2d at p. 81.) The *Bruneman* court noted that in response to the argument that the defendant had not been prejudiced by the judge's conduct because the judge did not say anything to the jury while in the jury room, the *Wroth* court held that "a defendant is not required to depend upon the memory or sense of fairness of the judge as to what occurs between the judge and jury at any time or place when he has no lawful right to be present. 'His right in this respect goes to the very substance of trial by jury.' " (*Bruneman, supra,* 4 Cal.App.2d at p. 81, quoting *Wroth, supra,* 47 P. at p. 107.)

Judge Thompson entered the jury room while the jury was deliberating, unaccompanied by counsel and with no court reporter, on four occasions. Each time, according to the judge's recollection as stated at the hearing to settle the record, the jurors posed questions to him concerning the instructions he had previously given them, and he responded to their questions. These unreported interactions were highly improper.[11]

 i. *The trial judge's providing ex parte supplemental jury instructions to a deliberating jury implicates Bradford's right to the assistance of counsel at a critical stage of the proceedings*

■ The rule against private communications between the judge and jury concerning any question from the jury " ' "is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case." ' " (*People v. Jennings* (1991) 53 Cal.3d 334, 384 [279 Cal.Rptr. 780, 807 P.2d 1009] (*Jennings*).) When the jury's inquiry arises in a situation where "counsel could have taken some action on the defendant's behalf to amplify, clarify, or modify the supplemental instruction or procedure," a "court's failure to give notice or afford an opportunity to respond [to the jury's inquiry] . . . constitute[s] statutory as well as constitutional error." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 68–69 [14 Cal.Rptr.2d 133, 841 P.2d 118].) By entertaining and responding to questions from the jury in unrecorded ex parte exchanges, Judge Thompson deprived Bradford of the opportunity for his attorney to have meaningful input into the court's responses to those questions, thereby violating Bradford's right to have his counsel present during a critical stage of the proceedings. (See *People v. Dagnino, supra,* 80 Cal.App.3d at p. 997 [judge privately giving jury instructions to jurors implicated right to counsel]; *People v. Knighten, supra,* 105 Cal.App.3d at pp. 132–133 [judge privately speaking with jurors to clarify a request for the rereading of testimony implicated right to counsel].)

 ii. *Judge Thompson's repeated entries into the jury room intruded on the privacy of the jury's deliberations, thus violating Bradford's right to trial by jury*

■ One of the guarantees the Sixth Amendment right to a jury trial encompasses "is that the jury's verdict must be based upon the evidence

---

[11] At oral argument, the deputy attorney general conceded that he has never seen a case in which the trial judge conducted himself in this manner. It is unclear whether it is Judge Thompson's usual practice to respond to jury inquiries by entering the jury room without a court reporter and answering their questions. Such a practice would be highly improper under any circumstances.

adduced at trial uninfluenced by extrajudicial evidence or communications or by improper association with the witnesses, parties, counsel or other persons." (*People v. Oliver* (1987) 196 Cal.App.3d 423, 428 [241 Cal.Rptr. 804] (*Oliver*) [finding the presence of a court reporter in jury room during jury deliberations to be nonprejudicial error].) "Equally implicit in this constitutional guaranty is the right to have the jury's deliberations conducted privately and in secret, free from all outside intrusions, and extraneous influences or intimidations." (*Ibid.*) Thus, "private, confidential deliberations outside of the presence of all nonjurors are an essential feature of the right to an impartial jury trial guaranteed by the Sixth Amendment. An infringement of that essential right therefore constitutes an error of federal constitutional dimension." (*Id.* at p. 429.)

In entering the jury room while the jury was deliberating, Judge Thompson compromised the privacy of the jury's deliberations. The record establishes that Judge Thompson not only interrupted the jury's deliberations, but that he was present while the jury deliberated, and that he offered further instructions to the jury, responded to their questions, and observed them alter what they had written on a dry erase board summarizing their understanding of the applicable law. After his visits with the jury, Judge Thompson expressed to counsel his impressions about the nature and progress of the jury's deliberations. Through his conduct, the judge violated the mandate that jury deliberations be "free from all outside intrusions, and extraneous influences or intimidations." (*Oliver, supra*, 196 Cal.App.3d at p. 428.)

Judge Thompson's second unreported interaction with the jury interfered with Bradford's right to jury trial in another way, as well. This visit to the jury room was not prompted by a note or any other communication from the jury. Rather, it was an uninvited intrusion during which the judge asked the jurors whether they intended to continue to deliberate. Although this second intrusion is distinguishable from the other three intrusions in that the judge did not on this occasion attempt to instruct the jury on a point of law, the jury could have perceived the judge's action as implicitly urging them to reach a verdict.[12]

---

[12] "A trial judge should refrain from placing specific time pressure on a deliberating jury and should never imply that the case warrants only desultory deliberation. Such comments risk persuading legitimate dissidents, whatever their views, that the court considers their position unreasonable." (*People v. Keenan* (1988) 46 Cal.3d 478, 534 [250 Cal.Rptr. 550, 758 P.2d 1081].) Although Judge Thompson apparently made no specific remarks about how long the deliberations were taking, and may not have intended to suggest to the jurors that they should rush to make a decision, the jury could easily have interpreted his abrupt invasion of the jury's private deliberations to so imply.

### iii. *Courts uniformly hold that it is error for a trial judge to engage in ex parte communications with a deliberating jury*

While there are few reported California cases in which the trial judge communicated privately with the jury in unreported exchanges while the jury was deliberating, courts in other jurisdictions have universally concluded that it is improper for a trial judge to engage in ex parte communications with a deliberating jury. (See *Brown v. State* (Minn. 2004) 682 N.W.2d 162, 168 (*Brown*) ["Virtually all jurisdictions agree that it is error for the judge to visit the jury room during deliberations"].) In *Brown*, the judge "made at least three visits to the jury room," after the jury began its deliberations—once to discuss adjournment, once to respond to a question from the jury, and once to inquire as to the progress of the jury's deliberations.[13] (*Id.* at pp. 164–165 & fn. 1.) The *Brown* court held that each of the judge's communications with the jury constituted error. Specifically, the court noted that in entering the jury room during deliberations to respond to a question from the jury, the judge violated Brown's right to be present at all stages of the trial, including communications with the jury, failed to comply with the requirement that all communications with a deliberating jury be conducted in open court, and undermined the integrity of the proceedings since one could not be certain that all of the judge's communications with the jury had been placed on the record. (*Id.* at pp. 166–167.)

In *State v. Mims* (1975) 306 Minn. 159 [235 N.W.2d 381] (*Mims*), the trial judge entered the jury room while the jury was deliberating, "without request or invitation of the jury and out of the presence of defendant and counsel."[14] (*Id.*, 235 N.W.2d at p. 383.) In concluding that the judge's conduct constituted reversible error, the *Mims* court first discussed the critical importance of the trial judge's role in a jury trial: "The trial judge, as the neutral factor in the interplay of our adversary system, is vested with the responsibility to ensure the integrity of all stages of the proceedings. This pervasive responsibility includes avoidance of both the reality and the appearance of any impropriety by so directing and guiding the proceedings as to afford the jury [a] fair and independent opportunity to reach an impartial result on the issue of guilt. Thus, the trial judge's position in performing his role and function before submission of the case is a powerful one and makes him an imposing figure in the minds of the jurors. Called upon to perform unaccustomed duties in strange surroundings, the average juror is very sensitive to any hint or suggestion by the judge—however proper the judge's conduct." (*Mims, supra*, 235 N.W.2d at p. 387.)

---

[13] On each occasion, the judge was accompanied by a court reporter.

[14] The judge was accompanied by a court reporter.

The *Mims* court also noted the significance of creating a physical barrier separating the judge and jury during the jury's deliberations: "The withdrawal of the jury into a separate room, the administration of the oath to their custodians the bailiffs, the traditionally locked door, and other safeguards which prevent any intrusion during deliberations, all serve to emphasize meaningfully the independence of the jury's final, collective, decisional process and to create an atmosphere in which any incorrect notions jurors may have that they are to be influenced by the judge might be removed." (*Mims, supra*, 235 N.W.2d at p. 388.)

Referring to the trial judge's incursion into the jury room while the jury was deliberating as an "indefensible practice" that required reversal, the *Mims* court went on to explain: "In view of the judge's dominant role during earlier stages of the trial, an uninvited entrance into the sanctity of the jury room for any purpose offends the integrity of the proceedings and risks influencing the jury's decisional process in some degree, however difficult to define or impossible to measure. At the very least, such unwarranted entrance disrupts the jury's deliberations, intrudes upon their independence, and transgresses the carefully drawn lines of demarcation between the functions of the trial judge and the functions of the jury. When such an intrusion occurs, we believe there is a significant interference with the orderly decisional process, and prejudice to the process results by the implication that the judge has the prerogative of entering the jury room and there exercising the same dominant authority he possesses in the courtroom. Further, when such an intrusion occurs in the absence of defendant and counsel, the adversary system of demonstrating prejudice by what was gestured or hinted or effected by other unrecorded conduct of those present is frustrated. When the communication relates to the case, the harm is compounded, for the intrusion, if not demonstrably coercive, violates defendant's right to be present at all stages of the proceedings." (*Mims, supra*, 235 N.W.2d at p. 388, fn. omitted.)

In *State v. Basit* (2005) 378 N.J.Super. 125, 130 [874 A.2d 1122] (*Basit*), in a factual scenario similar to circumstances of the present case, after receiving a note from the deliberating jury and discussing the jurors' questions and possible responses with counsel, the trial court stated, " '*I'm going to go in the jury room myself and give those responses to the jury*' " (original italics). Neither the prosecutor nor defense counsel objected. The judge then entered the jury room without a court reporter.

In holding that the trial judge's unrecorded discussion with the jury required reversal, the *Basit* court cautioned, "[A] judge must scrupulously avoid engaging in his own ex parte and unrecorded communications with the jury." (*Basit, supra*, 874 A.2d at p. 1126.) The court noted that New Jersey appellate courts "have repeatedly and clearly condemned judges' ex parte

communications with deliberating juries." (*Ibid.*) Emphasizing the sanctity of jury deliberations, the *Basit* court continued, "Fifty years ago, we said that communications 'between a trial judge in chambers and a jury engaged in deliberations in the jury room concerning any matter implicated ever so remotely in the consideration and decision of the case are forbidden by the essentials of our trial procedure as imperiling, perhaps, the principles of due process.' " (*Basit, supra,* 874 A.2d at p. 1127, quoting *Guzzi v. Jersey Central Power & Light Co.* (1955) 36 N.J.Super. 255, 264–265 [115 A.2d 629].) The *Basit* court held that ex parte communications by a judge to a deliberating jury are improper, stating, "[W]e condemn them in the strongest possible terms." (*Basit,* 874 A.2d at p. 1128.)

c. *Reversal is required*

Bradford contends that the court's error here "defies analysis by harmless-error standards." In an attempt to encourage this court to hold that the error requires automatic reversal, Bradford insists that this case involves not an issue of "judicial misconduct" as the People frame it, but an unconstitutional intrusion into the jury's deliberative process.

Although we agree with Bradford that the judge's conduct in this case was an unconstitutional intrusion into the jury's deliberative process, we disagree with his contention that *every* intrusion into the jury's deliberative process requires automatic reversal. (See *People v. Oliver, supra,* 196 Cal.App.3d at pp. 435, 432 [not every "infringement of any facet of [the right to trial by an impartial jury] constitutes reversible error per se," but, rather, the question is whether the intrusion amounts to "such a substantial abridgment of the right to a jury trial" that it constitutes "a miscarriage of justice without regard to the evidence"].) Courts have applied the standard of prejudice announced in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] to errors that involve improper communications between the judge and jurors. (See *Hogan, supra,* 31 Cal.3d at p. 850 [applying *Chapman* when court erred by sending exhibits to the deliberating jury without notifying counsel]; *Jennings, supra,* 53 Cal.3d at pp. 383–384 [applying *Chapman* when court erred by engaging in an ex parte communication with the jury].) However, there is authority that suggests that the deprivation of the right to counsel at a critical stage of the proceedings *is* cause for automatic reversal. (See *United States v. Cronic* (1984) 466 U.S. 648, 659 [80 L.Ed.2d 657, 104 S.Ct. 2039] [a trial is unfair if the accused is denied counsel at a critical stage of trial].) We need not decide which standard to apply, however, because it is clear that reversal of Bradford's conviction is required even under the *Chapman* standard of prejudice because the record is inadequate to permit meaningful appellate review of the issues Bradford raises.

In an attempt to provide this court with a sufficient record on appeal despite the lack of a transcript of what transpired during Judge Thompson's visits with the jury, Bradford's appellate counsel requested permission from the trial court to prepare a settled statement regarding the trial court's unreported communications with the jury.[15] "[T]he purpose of a settled statement is to provide the appellate court with a record of trial court proceedings for which there is no formal contemporary record, commonly because the court reporter's notes have been lost [citation] or because a court reporter was not present to record the proceedings. [Citation.] In other words, the settled statement is used for filling 'gaps in the [appellate] record.' [Citation.]" (*People v. Anderson* (2006) 141 Cal.App.4th 430, 440 [45 Cal.Rptr.3d 910].)

 "To determine whether a settled statement is adequate, we consider the issues defendant raises on appeal and the ability of the parties and the trial court to reconstruct the record. [Citation.]" (*People v. Cervantes* (2007) 150 Cal.App.4th 1117, 1121 [58 Cal.Rptr.3d 861] (*Cervantes*).) In considering whether it is possible to adequately reconstruct the trial proceedings "in a settled statement we consider: (1) whether the trial judge took 'detailed notes' [citation]; (2) whether the court is 'able to remember' the missing portion of the record [citation]; and (3) the ability of defendant's counsel to effectively participate in reconstructing the record. [Citations.]" (*Id.* at p 1121.)

Judge Thompson did not take detailed notes—or apparently any notes—documenting his unreported communications with the jury. While there is some discussion in the transcript of the original proceedings between the judge and counsel as to what occurred in the jury room, these discussions do not provide a sufficient record of the interactions between Judge Thompson and the jury. At the hearing to settle the record, Judge Thompson was not able to recall precisely what he said to the jury, or what they said to him, during these interactions. Defense counsel did not participate in the unreported proceedings in question, and thus could not assist in reconstructing the record.

Although Judge Thompson started to relate to counsel what had taken place in the jury room immediately after he returned from his first visit with the jury, the record is incomplete as to what the judge said to the jury during that first unreported interaction. It is not clear from the transcript of the original proceedings whether Judge Thompson gave the jury the example of malice he intended to give when he entered the room, and the settled statement does not clarify this issue. When asked whether he recalled giving

---

[15] In criminal matters, a settled statement may be requested when "a party learns that any portion of the oral proceedings cannot be transcribed . . . ." (Cal. Rules of Court, rule 8.346 as of Jan. 1, 2007, previously rule 32.3.)

the jury the example of express malice he had discussed with counsel, Judge Thompson said, "Steve, I cannot expressly say that's what I said, but I recall giving that type of example. It was nothing more than that. I acknowledge it was an incomplete statement." As a result, it is impossible for this court to determine whether, if given the opportunity, Bradford's counsel could have taken some action on Bradford's behalf that would have amplified, clarified, or modified the supplemental instructions.

In addition, it is undisputed that Judge Thompson erroneously instructed the jury multiple times on the issue of malice. Judge Thompson initially informed the jury that in order to find express malice, they would have to find that the defendant stated an intention to kill. He later repeated this erroneous instruction. After Judge Thompson and the attorneys eventually became aware of the error, the judge entered the jury room to inform the jurors about the error and to provide them with a correct instruction concerning express malice. However, it is impossible for this court to know whether the further instructions the trial court gave adequately cured or, rather, compounded the error, because these later instructions were not recorded.

Instead of a verbatim transcript of what was said in the jury room, much of the record consists merely of Judge Thompson's admittedly vague recollection as to what he might have said to the jury during each of the four occasions on which he communicated with the jury off the record. The record "does not indicate what the jury was told by the judge. We know only that the judge spoke to the jury out of the presence of counsel and off the record and, thus, we know only what the judge said he intended to tell the jury and not what he actually said or whether or to what extent any juror may have responded." (*Basit, supra*, 874 A.2d at p. 1126.)

The use or omission of a single word in a jury instruction can have significant ramifications.[16] Where, as here, the jury was particularly concerned with the issue of malice, the wording of any additional instructions to the jury on the issue of malice could be critically important. Judge Thompson's admittedly imprecise and incomplete recollection of what he might have said to the jury and what the jurors said to him is simply not sufficient to permit meaningful review.

---

[16] The Legislature has recognized the critical importance of having an accurate record of the court's instructions to a jury. Trial courts are required by statute to have a court reporter transcribe *all* oral instructions to the jury. "All instructions given shall be in writing, unless there is a phonographic reporter present and he takes them down, in which case they may be given orally; provided[,] however, that in all misdemeanor cases oral instructions may be given pursuant to stipulation of the prosecuting attorney and counsel for the defendant." (§ 1127.) By instructing the jury without a court reporter present to record the instructions, the trial court failed to comply with this statutory obligation.

What we can discern from the record is that Judge Thompson drew a number of conclusions about the progress, character, and nature of the jury's deliberations based on his repeated interactions with the jury. Judge Thompson discussed with counsel what he believed the jury's views were regarding malice, and his impression that the jury's concern was whether Bradford had to have had the intent to kill. Judge Thompson related to counsel a relatively detailed understanding of how he believed the "brightest" juror on the jury viewed the case. Judge Thompson's descriptions of the jury's deliberative process reveal the depth of his interactions with the jury.

What is unknown—and would be critically important in evaluating the impact of the error in this case—is the effect that Judge Thompson's ex parte conversations with the jury had on the jury's deliberative process. In view of the fact that a mere "hint or suggestion" (*Mims, supra,* 235 N.W.2d at p. 387), as to a trial judge's view of a case can alter the average juror's view of the case, it is clear that Judge Thompson's extensive unrecorded ex parte conversations with the jurors in which he instructed them, at times inaccurately, as to the elements of the charged offense, may very well have affected the jury's deliberations.

Despite the existence of a "settled statement," and contrary to the People's contention that the record provides an "adequate and reliable basis upon which appellant could pose his appellate issues and upon which this court could reliably resolve those claims," the record is inadequate to allow full appellate review of the question whether the judge's interactions with the jury affected the verdict.[17] Neither the original trial transcript nor the settled statement provides the level of detail that would be necessary to allow this court to meaningfully review the effect of the court's error. (See *Brown, supra,* 682 N.W.2d at p. 167 [" 'Generally speaking, a reconstructed record cannot be as precise or comprehensive as a record made at the time of trial. At a minimum, the lack of a record compounds the lack of confidence society can have in the integrity of proceedings. . . . A record is critical to ensure adequate appellate review and a fair process' "].)

" ' "It is far better that a defendant be retried than that the state should permit itself to be subject to the criticism that it has denied an appellant a fair and adequate record on appeal." [Citations.] The burden of requiring a new hearing is small indeed compared to the importance of ensuring that justice is

---

[17] Although Bradford raises the inadequacy of the record on appeal as a separate procedural argument, we view the fact that the record is incomplete as another aspect of the trial court's error in engaging in improper, unreported communications with the jury. The trial judge's interacting with the jury off the record and outside counsel's presence had the additional consequence of limiting Bradford's ability to assess potential error, as well as this court's ability to determine whether the improper interactions were prejudicial to Bradford.

done on an adequate record on appeal.' [Citation.]" (*Cervantes, supra,* 150 Cal.App.4th at p. 1122, italics omitted.)

Because this court cannot assess the effect of the judge's improper interactions with the jury, we must reverse Bradford's conviction and remand the case for retrial.

**B.** *The amended information provided Bradford with sufficient notice of the charges against him*

Bradford contends that the People failed to plead the existence of malice in the information that charged him with murder, and that malice is an essential element of the offense of murder. According to Bradford, the fact that the information did not include the word "malice" means that he could not properly be convicted of murder, but only manslaughter.

### 1. *Additional background*

The amended information charges, in pertinent part: "On or about and between November 1, 2003 and November 11, 2003, MATTHEW RAY BRADFORD did unlawfully murder PEDRO LOPEZ, a human being, in violation of PENAL CODE SECTION 187(a)."

Bradford pled not guilty to the charge of murder in the amended information and denied the sentencing enhancement allegations. Bradford did not file a demurrer to the charging document, and he did not object to the sufficiency of the accusatory pleading at any time prior to, during, or after trial.

### 2. *Analysis*

■ " 'Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them.' [Citation.] But '[w]e have long held that under this state's statutory scheme, an accusatory pleading charging a defendant with murder need not specify the theory of murder on which the prosecution intends to rely.' [Citation.] Although there may be some situations in which the United States Constitution may require greater specificity, generally an accused will receive adequate notice of the prosecution's theory of the case from the evidence adduced at the preliminary examination or the indictment proceedings. [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1205 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

■ In this case, the accusatory pleading itself provided adequate notice of the prosecution's theory of the case. Specifically, by alleging that Bradford

committed "murder," the information provided him with sufficient notice of the charges against him. "Murder is the unlawful killing of a human being, or a fetus, *with malice aforethought.*" (§ 187, subd. (a), italics added.) Thus, a charge of "murder" necessarily includes the allegation that the accused killed another human being with malice aforethought. If the information had simply alleged that Bradford unlawfully killed another human being, such an allegation would likely have been insufficient to inform Bradford that he was facing a murder charge. However, the amended information included the term "murder," thus placing Bradford on notice that he would have to defend against a charge of murder.

The information also alleged that Bradford committed the murder "for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members, within the meaning of PENAL CODE SECTION 186.22(b)(1)." Implicit in this allegation is an accusation that the killing was done intentionally, thereby putting Bradford on notice that he would have to defend against a charge of murder, not manslaughter. It is unreasonable for Bradford to suggest for the first time on appeal that the charging document did not sufficiently inform him of the charge against him because it did not include the word "malice" when describing the offense of murder. While we agree that the better course of action would have been to track the language of the relevant statute in the charging document, the information in this case was sufficient to satisfy the requirements of due process and the Fifth and Sixth Amendments.

Even if the accusatory pleadings were not sufficiently specific on their own, the testimony presented at Bradford's preliminary hearing put the defense on notice that the prosecution intended to establish that Bradford intentionally shot at rival gang members in order to gain more respect from his gang. (See *People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171] ["Although we have recognized that there are situations in which the United States Constitution may require greater specificity [citations], generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing or at the indictment proceedings. [Citation.]"].) Bradford was on notice, from the testimony the prosecutor elicited at the preliminary hearing, that the prosecution was seeking to establish that the killing was done with malice. We conclude that the testimony presented at the preliminary hearing " 'adequately inform[ed] the defendant of the prosecution's theory regarding the manner and degree of killing' [citation], and thus complied with the notice requirements of the federal Constitution." (*Ibid.*)

The record supports our conclusion that Bradford received sufficient notice of the charges against him. The defense never objected to the sufficiency of the information, and Bradford did not demur to the information on the basis that it failed to state the offense adequately to provide him notice of the charge he was facing. Additionally, the defense at no time indicated any surprise about the prosecution's theory of the case, nor did the defense object to the court instructing the jury as to murder with malice. The fact that the information in this case did not include the word "malice" does not provide a basis for reversing Bradford's second degree murder conviction.

C. *The court's instruction that the jury must acquit Bradford of murder before it could return a verdict of voluntary manslaughter was not erroneous*

Bradford contends that the trial court erred in instructing the jury that it must unanimously agree to acquit the defendant of a greater charge before it could return a verdict on a lesser charge. Bradford acknowledges that in *People v. Fields* (1996) 13 Cal.4th 289 [52 Cal.Rptr.2d 282, 914 P.2d 832], the Supreme Court determined that such an instruction is proper, but he nevertheless suggests that this court "should urge the Supreme Court to reconsider its holding." According to Bradford, an "acquittal first" instruction violates his right to due process and his right to a jury trial because it encourages false unanimity and coerced verdicts.

This argument has been considered and rejected by the Supreme Court. Recently, in *People v. Jurado* (2006) 38 Cal.4th 72, 125 [41 Cal.Rptr.3d 319, 131 P.3d 400], the Court reiterated its refusal to reconsider the question: "Defendant maintains that this 'acquittal first' instruction violated his federal constitutional rights to due process and to a fair and reliable jury consideration of lesser included offenses in a capital case. [¶] As defendant concedes, this court has repeatedly rejected the same contention. (E.g., *People v. Nakahara* (2003) 30 Cal.4th 705, 715 [134 Cal.Rptr.2d 223, 68 P.3d 1190].) As we stated in *Nakahara*, '[w]e see no reason for reconsidering these decisions.' [Citation.]"

Thus, under clear Supreme Court precedent, the trial court did not err in instructing the jury that it had to find Bradford not guilty of the greater offense before it could return a verdict on the lesser offense.

## IV.

## DISPOSITION

The judgment is reversed. The case is remanded for retrial.

McDonald, Acting P. J., and O'Rourke, J., concurred.